## 37747.  ROYAL CROWN BOTTLING COMPANY OF MACON *v.* BELL.

DECIDED SEPTEMBER 25, 1959—REHEARING DENIED OCTOBER 20, 1959.

*Sell & Comer, E. S. Sell, Jr., John D. Comer,* for plaintiff in error.

*Jones, Sparks, Benton & Cork, Frank C. Jones,* contra.

NICHOLS, Judge.  ■  Error is assigned on the judgment overruling the general demurrer to the petition.  The only contention made in the brief of the plaintiff in error is that a parent is not entitled to sue for the full value of the life of a child when such child is married, the contention being that recovery by a parent under Code (Ann.) § 105-1307 is limited to those cases where the parental bond has *never* been severed.  Much emphasis is placed on the language used by this court in *Central of Ga. Ry. Co. v. Tucker,* 99 *Ga. App.* 52, 57 (107 S. E. 2d 665), as follows: "Obviously the only exception to the right of the parent to bring an action for the value of the child's life has no reference to the child's age, but simply provides that in the event the child is

married his wife and children have the exclusive right to sue for the value of his life." Following this quotation, relied on so heavily by the defendant, it was said: "The statute does not provide any other limitation upon the right of the parent to sue for the value of the child's life and no other exception can be read into it."

The holding in that case was not that, once a person is married, the parent is forever precluded from bringing an action for the homicide of the child, but that where the person killed is *survived* by a wife or children, the statute gives them the exclusive right to sue for the full value of the life of the deceased. Accordingly, the contention of the defendant that its general demurrer should have been sustained since the parental bond had previously been severed by the marriage of the deceased, and although, under the allegations of the petition, she was not survived by a husband or children, the plaintiff, her mother, was not entitled to sue for the full value of her life, is without merit.

■ The defendant demurred specially to paragraph 17 of the petition on the ground that the alleged value of the life of the deceased, a 17-year-old minor, was a conclusion not supported by well pleaded facts and called "upon the plaintiff to allege the earning capacity of her daughter and other facts which might tend to show the value of the life of the decedent."

The plaintiff demurred to one paragraph of the answer which alleged: "Further answering, defendant says that the said John Ernest Pennington was appointed administrator of the estate of Harold Pennington by order of the Ordinary of Baldwin County, Georgia, dated July 7, 1958, that the said administrator and defendant herein have entered into an agreement for the compromise of his claim for the death of Patricia Bell Pennington, that the Ordinary of Baldwin County, after a consideration of the evidence, has approved said settlement, and that the administrator aforesaid has executed a release to defendant herein relieving it from any and all liability which defendant may have to said administrator on account of the death of Patricia Bell Pennington." The plaintiff's demurrer to the quoted paragraph of the defendant's answer was sustained while the defendant's special demurrer to the paragraph of the petition was overruled,

and the defendant assigns error on both judgments adverse to it.

Not only error but hurt must be shown in order to obtain a reversal of the judgment of the trial court (*Gulick* v. *Mulcahy*, 95 *Ga. App.* 158, 160, 97 S. E. 2d 362), and, "Ordinarily, error is presumed hurtful unless it appears to have had no effect upon the result of the trial." *Rogers* v. *Johnson*, 94 *Ga. App.* 666, 682 (96 S. E. 2d 285). Therefore, assuming but not deciding that the judgments were error, the question presented is whether the defendant was harmed by the judgments adverse to it.

As to the value of the life of the deceased, a minor child who had not completed her education nor definitely selected a vocation, since the plaintiff could only recover the value of the life of the deceased as found by the enlightened conscience of the jury (see *Betts Co.* v. *Hancock*, 139 *Ga.* 198, 207, 77 S. E. 77, and *Collins* v. *McPherson*, 91 *Ga. App.* 347, 85 S. E. 2d 552), it was harmless if error to overrule the defendant's special demurrer.

The defendant, elsewhere than in the paragraph of the answer stricken on demurrer, alleged that the deceased was survived by a husband and that therefore there was no right of action in the plaintiff, the mother of the deceased. Accordingly, its defense was pleaded, and whether the defendant has settled or compromised the claim for the death of the deceased with the administrator of the estate of the husband of the deceased would not relieve the defendant from liability in the present case unless the plaintiff's deceased daughter was in fact survived by her husband and if she was in fact survived by her husband the plaintiff here would not be entitled to recover regardless of whether the defendant had entered into a compromise or settlement with the administrator of the estate of the husband of the deceased. Therefore, the defendant was not harmed by the judgment striking the allegations of its answer quoted above.

■ Special ground 1 of the amended motion for new trial complains that a new trial should be granted because of alleged improper conduct on the part of a juror during the trial of the case. Under the decisions of the Supreme Court in *Weatherby* v. *State*, 213 *Ga.* 188, 197 (97 S. E. 2d 698) and *Morakes* v. *State*, 201 *Ga.* 425 (3) (40 S. E. 2d 120), where, as here, there was conflicting evidence presented to the trial court as to the conduct

of the juror and the trial court must pass on the issue, and its discretion is not shown to have been abused, such discretion will not be controlled by the reviewing court. Such is not made to appear in the case sub judice.

■ The defendant contends that the trial court erred in sustaining a plea of entrapment by the plaintiff's counsel during the trial of the case and permitting the plaintiff's witness to be cross-examined by the plaintiff's counsel. "Specific grounds of objection to admission of evidence, not presented when the evidence was offered on the trial, do not raise questions for decision on review." *Wynes* v. *State*, 182 *Ga.* 434 (1) (185 S. E. 711). " 'Although there may be a ground of objection to testimony which would have been good if made, yet if the objection made be not good, it will be overruled.' *Cox* v. *Cody & Co.*, 75 *Ga.* 175 (1a)." *City of Commerce* v. *Bradford*, 94 *Ga. App.* 284, 291 (94 S. E. 2d 160). The only ground of objection made on the trial to the plea of entrapment and the cross-examination was as follows: "We object to the Court permitting Mr. Jones to plead entrapment, because Mr. Jones has not shown that the witness has made any contradictory statement to him. The witness has merely explained the statement that he made, and we say the fair import of the statement that the witness made is perfectly consistent with what he just said on the stand, and at the appropriate time we will expect to introduce the memorandum in evidence, Your Honor, to show that there's no inconsistency. We don't think that Mr. Byars has changed anything." Accordingly, the contentions that the evidence adduced, prior to the plea of entrapment, was not hurtful to the plaintiff, that the plaintiff was not surprised, etc., will not be considered.

The plaintiff introduced in evidence a written memorandum of a previous conversation out of court wherein the witness purportedly stated that he arrived at the scene of the collision at about 8:45 a.m., parked his automobile and walked to the scene but did not go down into the ditch, where both trucks had come to rest after the collision, and that shortly after he arrived, "he heard a colored man in his early thirties with a Yankee accent telling a group of people that he was a doctor and that he had gone down to the pickup truck shortly after the accident

occurred, and that he thought the girl in the pickup was alive but that the boy in the pickup was dead." The witness testified that the person who identified himself as a doctor stated that he went to the truck where the plaintiff's daughter was: "Question: And what did he say he found, if anything? Answer: He said he found a hole up here—a big place in her thigh torn out; he said she was dead. Question: What did he say as to whether she was alive or dead when he first got there? Answer: He went down to see if she was dead; that was the remark that he made about her thigh; he said he saw this place on her side and he knew she was dead. Question: Did he make any statement about the boy? Answer: No; he didn't check the boy; he said the boy looked like he was dead, so he didn't check the boy; he was checking the girl; he didn't check the boy at all so he said there." The only fair implication of the original statement was that the girl was alive but that the boy, her husband, was dead while the statement made on the trial of the case was that the plaintiff's daughter was dead when he first saw her, as was her husband. Therefore, the ground of objection, made on the trial of the case, that the plaintiff had not shown that contradictory statements had been made is without merit.

■ Since the purpose of a plea of entrapment is to allow the impeachment of a witness called by the party pleading entrapment, the contention of the defendant, in special ground 4, that the trial court erred in failing to charge on the subject of entrapment even without a timely written request is without merit in view of the opinion of the Supreme Court in *Hunter* v. *State*, 136 *Ga.* 103 (4) (70 S. E. 643), as follows: "In the absence of a timely written request, failure to charge 'upon the subject of impeachment of witnesses furnishes no ground for the grant of a new trial." See also *Hall* v. *State*, 31 *Ga. App.* 783 (3) (122 S. E. 98), and *Washington* v. *State*, 138 *Ga.* 370 (1) (75 S. E. 253).

■ Special ground 5 assigns error on the failure to grant a mistrial because of alleged improper argument by the plaintiff's counsel. The alleged improper argument took place shortly before the noon recess of court when final arguments were being made to the jury. Shortly after the alleged improper remarks

were made plaintiff's counsel concluded his argument and the court gave the jury precautionary instructions concerning the members' proper conduct during the noon recess and recessed court. As the judge was leaving the bench, after the jury had been dismissed for lunch, the defendant's counsel approached him and stated that he had a motion to make. Thereupon the court asked counsel for both parties to go to his chambers for the purpose of hearing the motion, where such motion was overruled.

As was said in *Smith* v. *State*, 204 *Ga.* 184, 188 (48 S. E. 2d 860), and quoted by this court in *Starr & Sons Lumber Co.* v. *York*, 89 *Ga. App.* 22 (3) (78 S. E. 2d 429): "The trial judge in passing upon a motion for mistrial on account of alleged improper argument or remarks (by counsel) to the jury is vested with a broad and sound discretion, and his ruling will not be controlled by this court unless manifestly abused."

Applying this law to the alleged improper argument in the present case, which was to the effect that *this is the only time, in counsel's opinion that anyone will have their day in court for the redress of this wrong,* and the facts surrounding the ruling of the court, no such abuse of discretion is shown. Almost immediately after such alleged improper argument was made the jury was dismissed for lunch, and approximately two hours intervened between the time the alleged improper remark was made and the first opportunity of the trial court to correct such remark if it in fact was improper after the defendant's motion for mistrial was made. It would have been necessary for the trial court to repeat, at least in substance, the remark in order to instruct the jury to disregard it. This presumably could have caused more harm to the defendant than the alleged remark itself, and since the court in its instructions to the jury repeatedly charged that, if the plaintiff did *not* prove that her deceased daughter was not survived by her husband, the investigation would end and the verdict should be for the defendant, it cannot be said that the trial court did not follow the correct procedure under the circumstances. However, where as here the defendant's defense was based on the theory that someone other than the plaintiff was the proper party to seek redress against it for

the alleged wrong, if anyone had such right, it cannot be said that the argument was in fact improper.

■ In special grounds 6 through 10 the defendant assigns error on various excerpts of the court's instructions relating to the fact that, in the event the jury found that the plaintiff's daughter and her, the daughter's, husband died simultaneously, the plaintiff would be the proper person to sue for the value of her life and, if otherwise entitled to recover, would be entitled to a verdict.

The objection to these excerpts of the charge is that there was no evidence that the couple died simultaneously. In *Pollard* v. *Gorman*, 52 *Ga. App.* 127, 131 (182 S. E. 678), where a husband and wife were killed as the result of their automobile being struck by a train it was held: "Where the testimony showed that the locomotive, moving at a speed of about 50 miles an hour, struck at about the center the automobile in which the mother, sitting on the front seat with her husband driving, was traveling over a public crossing, that the automobile was picked up and carried on the front of the locomotive for a distance of from 500 yards to a half mile beyond the crossing before the train stopped after throwing on the emergency brakes, that both persons were found dead inside the car immediately thereafter, that the body of the mother was found against that of her husband, and that she had been in excellent health, weighing about two hundred pounds, and attending regularly to heavy household duties,—in the absence of any evidence as to the nature of their wounds, the jury were not compelled to find that the mother died first, even though she sat on the side of the car where the locomotive first struck, but were authorized to find that death came simultaneously to both persons."

In the case sub judice there was evidence that the defendant's truck crossed the center line of the highway at a speed of up to 99 miles per hour and struck the pickup truck which was traveling in the opposite direction and in which the deceased daughter of the plaintiff was riding with her husband, that the defendant's truck stopped in a ditch some 75 feet from the point of impact, that debris from such truck scattered as far as 147 feet from the point of impact, that the pick-up truck in which

the plaintiff's daughter was riding came to rest in a ditch 60 feet from the point of impact, and that its engine was found 75 feet from such point of impact, the engine having been thrown completely out of the body of the pickup truck. The only evidence as to any specific injury was that the daughter had a laceration on her leg, described by various witnesses as being from a slight wound to a fatal wound. Some witnesses testified that for various reasons they believed either the daughter or her husband was alive when they reached the scene of the collision, and there was testimony by a deputy sheriff who investigated the collision that, when he reached the scene shortly after the collision, both the plaintiff's daughter and her husband were dead. While the evidence was in sharp conflict, there being evidence that each of the occupants of the pickup truck survived the other as well as the above evidence that both were found dead shortly after the collision by one of the investigating officers and the res gestae referred to in the fourth division of the opinion, it cannot be said that the excerpts from the charge dealing with simultaneous deaths was not authorized by the evidence.

■ The sole remaining special ground of the motion for new trial is that the verdict was excessive. The decedent was seventeen years of age at the time of her death; she had planned to return to high school in September following her death in August to complete her senior year and then to either attend business school or become a teacher. She had been a member of the "Future Teachers of America," an organization whereby she did practice teaching while still in high school, helped the regular teachers make out examinations, reports, etc. She was a housewife who also performed various services for her mother. There was evidence that the decedent had worked two summers as a waitress while in high school and earned $17 per week one summer and $15 per week plus tips of approximately $3 per day and two meals per day the other summer.

The defendant contends that the amount of recovery authorized would have to be based on the prior earnings of the deceased, to wit: the amount of earning capacity as shown by her earnings during the time she held "summer jobs" while a high school student. This contention is without merit for the compensation

earned by a child while still in school is not a criterion for fixing such child's future earning capacity. For a discussion of this question see *Collins* v. *McPherson*, 91 *Ga. App.* 347, supra. To hold that the amount of recovery authorized in a case where a high school child has been killed should be limited to the present cash value of future earnings based on the earnings of such child while holding summer or part-time jobs would be to require a lower verdict in cases where an energetic and ambitious child has earned spending money than in those cases where a child of the same age and same educational background and with the same plans and expectations for the future spent its vacation time only in play. This the law does not require.

While the deceased was actually a housewife, she had not reached that point in life where a jury would be bound by proof of earnings and earning capacity in arriving at its verdict. See in this connection *Betts Co.* v. *Hancock*, 139 *Ga.* 198, supra, a case dealing with the prospects of future earnings of a child thirteen and one-half years old who had received permanent injuries.

Under the circumstances of the present case where the deceased had not reached her majority, had not completed her formal education and, though married, was planning a career either in business or as a school teacher, the jury was not required to base its verdict finding the value of her life on the prior compensation earned by such deceased in summer jobs which earnings would certainly not reflect her total potential earning capacity. Under these circumstances the verdict for $54,000 was not so excessive as to show bias or prejudice on the part of the jury.

■ As shown in the seventh division of the opinion a finding that the plaintiff's daughter was not survived by a husband, so as to allow the plaintiff to recover, was authorized and the undisputed evidence was that the proximate cause of the death of the plaintiff's daughter was the negligence of the defendant's employee while operating the defendant's truck in the course of the defendant's business. Therefore, a finding for the plaintiff was authorized by the evidence and the trial court did not err in denying either the defendant's motion for new trial on

the usual general grounds or its motion for a judgment non obstante veredicto in accordance with its motion for a directed verdict.

*Judgment affirmed. Gardner, P. J., Townsend, Carlisle and Quillian, JJ., concur. Felton, C. J., concurs in part and dissents in part.*

FELTON, Chief Judge, concurring in part and dissenting in part. I concur in the judgments overruling the general and special demurrers to the petition. I dissent from the judgments of the majority for the reason that I do not think the court should have submitted to the jury the question whether the deaths of Mr. and Mrs. Pennington were simultaneous.

The common-law rule regarding death in a common catastrophe is as follows: "Where two or more persons perish in the same disaster and there is no fact or circumstance to prove which survived, the law will no more presume that all died at the same instant than it will presume that one survived the other." 16 Am. Jur. 34, Death, § 41; Green's Georgia Law of Evidence, § 53, Survivorship; *Roberts v. Hardin*, 179 *Ga.* 114 (175 S. E. 362) and cases cited by dissenting Justice Hutcheson; 25 C. J. S. 1069, Death, § 11; Wigmore on Evidence, 3rd Edition, § 2532; *Pollard v. Gorman*, 52 *Ga. App.* 127 (182 S. E. 678).

The plaintiff in this case had the burden to prove that Mrs. Pennington survived her husband or that her death and that of her husband were simultaneous. There is no evidence in my judgment which would have authorized the jury to find that either of the parties might have survived the other. In my opinion there is no evidence, positive or circumstantial which would authorize the finding that the deaths were simultaneous. The jury could not have found that the positive evidence on both sides was impeached on the theory that any witness was impeached by the disproof of facts testified to for the reason that a witness cannot be impeached by this method unless contrary testimony is accepted by the jury. A jury cannot arbitrarily discard all conflicting testimony and create a kind of synthetic and artificial situation by throwing away all pertinent evidence and fix a status where there is no evidence as to which person survived, when there is no evidence, positive or circumstantial to

establish simultaneous death. The only thing which would have justified the jury in ignoring the positive testimony is that there was circumstantial evidence, inconsistent with the positive testimony, which would have authorized a finding that the deaths were simultaneous. In my opinion there is no circumstantial evidence from which a reasonable and rational conclusion that the deaths were simultaneous could be drawn. "A jury in arriving at a conclusion upon disputed issues of fact may believe a part of the testimony of a witness or witnesses, and reject another part thereof, it being their duty to ascertain the truth of the case from the opinion they entertain of all of the evidence submitted for their consideration." *Sappington* v. *Bell,* 115 *Ga.* 856 (42 S. E. 233); *Lawhon* v. *Henshaw,* 63 *Ga. App.* 683 (11 S. E. 2d 846). "It is the province of the jury to determine which of the witnesses has spoken the truth, even if in order to do so it is necessary to impute perjury to one or the other." *Champion* v. *State,* 84 *Ga. App.* 163, 166 (65 S. E. 2d 280); *Hunter* v. *State,* 136 *Ga.* 103 (1) (70 S. E. 643). It is the duty of the jury to reconcile the conflicts if possible and not to impute perjury to anyone and if that cannot reconcile the conflicts it is then their duty to believe that witness or those witnesses who they think are most entitled to credit at their hands. *Teague* v. *Keith,* 214 *Ga.* 853, 856 (108 S. E. 2d 489). Sporrer *v.* Ady, 150 Md. 60 (132 A. 376).

The only evidence which even purports to establish simultaneous deaths is that which shows that both parties were dead within fifteen minutes from the time of the accident and the testimony of a witness who stood on the embankment above the wrecked vehicles two minutes after the wreck that he heard some unidentified person say that both of the parties were dead. Besides being the rankest kind of hearsay, the testimony next above referred to has no probative value at all. The testimony of this unidentified person would not be admissible unless he stated facts to support his conclusion. Especially would such a rule apply as to the deaths of those here involved.

The bystander's statement was not shown to be a spontaneous and involuntary reaction to the occurrence, assuming that the question of the fact of two persons dying at the same time is

such an act or occurrence as is contemplated by Code § 38-305. It does not appear that the bystander made a spontaneous exclamation upon arriving at the scene. If such were the case the evidence would not be admissible because it would have been a layman's conclusion or opinion. If the statement was made after a careful examination of the bodies it was not a spontaneous exclamation but a considered and deliberate judgment. Furthermore the statement may have been based on what some other bystander stated who arrived at or about the same time or before or after the person whose statement was testified to. The value of a spontaneous exclamation is its trustworthiness and in this case there is no basis of fact for such trustworthiness as the cross-examination of the bystander would conclusively show that the declaration was not admissible as a spontaneous exclamation but either a deliberate statement or lay conclusion.

"An exclamation of a bystander which merely expresses an opinion or conclusion is inadmissible." *Harnage* v. *State,* 7 *Ga. App.* 573 (67 S. E. 694) ; *Hill* v. *State,* 17 *Ga. App.* 294 (86 S. E. 657) ; *Carr* v. *State,* 96 *Ga.* 284 (22 S. E. 570) ; *Roberts* v. *Hardin,* 180 *Ga.* 757 (180 S. E. 634) ; Jones on Evidence, p. 633, § 345. See *Travelers' Ins. Co.* v. *Sheppard,* 85 *Ga.* 751, 776 (12 S. E. 18).

The ruling in *Pollard* v. *Gorman,* 52 *Ga. App.* 127, supra, is not controlling here because there was evidence in that case that both parties were immediately found dead. While I doubt the correctness of that ruling, it distinguishes this case. I think the result reached in the *Pollard* case was right because there was no evidence as to which person died first, which brings the common law into play.

In this case the jury could have reasonably made a mistrial, but all twelve jurors could not disregard all of the sworn testimony and create an artificial "lack of evidence" and decide that the deaths were simultaneous.

The evidence on survival of the respective parties was substantially as follows: Rev. Luther E. Cook, who had been driving behind the Pennington pick-up truck for several miles, saw the collision and immediately stopped his car at the scene. On getting out, he saw two colored boys, who were helpers on

the drink truck, crawling up the embankment and just as he started to remove them to the roadway another man, later identified by him as the witness O'Neal, came up and helped him carry the boys and lay them down. After accomplishing this the witness and O'Neal went down the embankment to examine the wrecked vehicles. The witness first went to the pick-up truck on the side where the woman, Mrs. Pennington, was lying. He saw no movement or signs of life and further observed that "she had a cut on her thigh and that cut was not bleeding." He did not take her pulse or make any further examination of the body. Having decided that she was dead, he went around to the side of the pick-up truck that the driver was on and heard the man, Mr. Pennington, groan in agony. He observed the man "breathing—gasping for breath—breathing fast" with what he described as a continual gasping. He then went over to the drink truck to investigate the condition of its occupants and, after a short time started back toward the pick-up truck to see if the driver was still alive at which time the man in the cab of the pick-up "gave a violent jerk and blood came down and that was all the movement that he saw from him." He saw no further movements or signs of breathing and heard no further groans.

L. D. O'Neal, a witness for the defendant, was employed on a construction job about a quarter of a mile from the scene of the accident. Hearing the collision, he jumped onto a dump truck and immediately proceeded to the scene, sending the truck driver back to call the officers and the ambulance. Rev. Cook, whom he did not know at the time, was already standing on the shoulder of the road. The witness helped to remove one colored boy onto the shoulder and Cook helped another up to the road by himself. He and Cook proceeded down the embankment to the side of the pick-up truck on which the girl was lying. The witness reached in and caught hold of the girl's head and moved it. It "moved funny like, kind of a jerk like—didn't move smooth," from which he concluded that her neck was broken. He felt her wrist and tried for a minute to find her pulse but was unsuccessful. He observed a deep wound on her thigh which was not gushing blood but "there might have been a seepage from it." As to whether there was any possible breathing on

her part he looked to see but "couldn't tell any." He "didn't hear any noise at all from the girl." Having concluded that she was dead, he looked to see if he could do anything for the boy. He did not try to feel the boy's pulse and did not touch him at all but heard him moan "off and on" while he was there "approximately three or four minutes." He did not observe any signs of breathing on the part of the boy but formed an opinion "that he was living at the time . . . by the noise that was being made." He further testified that "one of his arms moved a little; now whether it was a reflex of the muscles or whether when I stepped on the running board up on the side of the truck it shook it and his arm slipped, I couldn't say." That was the only movement that he saw. The witness then went over to the drink truck for a short time and upon returning to the pick-up truck "I didn't hear any noise . . . I just figured he was dead."

Hugh P. Davidson, also a witness for the defendant, lived on a side road near the scene of the accident. After hearing the crash on the main highway he dressed and rode over to the scene, arriving about 10 or 15 minutes after the wreck. He went down to the pick-up truck, reached in and felt the girl's wrist but could find no pulse whatsoever. He saw no breathing or other signs of life and concluded that she was dead. He also felt the boy's wrist and could feel no pulse nor did he see any movement on the boy's part but he testified that the boy made one or two gasps "kind of like a shortness of breath," but aside from that he saw no life whatever in him. "I figured he died right then after the gasp—I'm no doctor; I don't know whether he died then or not, but I mean that's what I thought; I thought he was dying then. There was no other sign of life in him after that gasp or two."

For the plaintiff, James Avera, Deputy Sheriff of Bibb County, testified that he was on patrol on the morning of the accident and that he reached the scene approximately 11 minutes after he was first notified. He first went to the pick-up truck and attempted to feel the wrist of the young lady to ascertain whether there was any pulse. In the course of this examination he "either got a very weak pulse movement or a muscle reflex"

but he "only felt it one time." There was no sign of breathing or motion on her part. In his opinion, the girl was alive. He felt no reaction from the young man in the pick-up truck and thought that he was dead.

Bennie Otha Addleton, a witness for the plaintiff, was in the driveway of his home near the scene when the crash occurred. He jumped in his car and arrived in less than two minutes after the wreck. He did not go down the embankment but asked someone down below him about the condition of the occupants of the pick-up truck. Some fellow down next to the truck stated that they were both dead, but he never got any closer to the bodies himself.

Dr. Leonard H. Campbell, Bibb County Medical Examiner, was called as a witness by the plaintiff. He testified that he examined the bodies of Mr. and Mrs. Pennington at the Macon Hospital and determined that the cause of death in each case was massive injuries to the head and chest. There was some blood on each of the bodies but "there was no laceration that caused death." That "it was my opinion that death probably was immediate, and that due to the nature of the injuries, the man, being situated in the position of the truck that he was supposed to have been behind the steering wheel, that he died first." On examination of the bodies an hour after death occurred there is no clinical means which can be used to determine with any degree of certainty which one died first. Doctors use tests other than feeling the pulse to ascertain whether or not a person is dead or alive, such as checking the eyelids, listening to the chest for a heartbeat and checking for vapor formed by breathing. "Frequently, after respiration and heartbeat have stopped, a person will gasp two or three times—it's not actually a movement of air in or out—it's just opening of the mouth and occasionally moving of the air in and out." This frequently results in a noise which is termed a "death rattle." This is not a groan or moan as it does not involve the vocal chords. This phenomenon could occur, without any stimulation, about 5 or 10 minutes after death and might be mistaken by an untrained observer for some form of breathing or respiration. As to whether in feeling for the pulse of a person, some muscle contraction

might be mistaken for a pulse, "it's hard to conceive of a muscle contraction over the wrist producing that phenomenon." On cross-examination, Dr. Campbell testified that if the girl did have a deep gash in the thigh and if there was practically no bleeding from that cut, it is difficult to say whether this would suggest that the heart was no longer pumping blood because of "so many other factors like shock or the like." But "if there was no bleeding at all, the wound would have to have been caused at the time of death or afterwards." If a person who is apparently dead has a head that flops or is pushed back further than normal that would be suggestive of immediate death, but the witness made no test which would decide whether or not the young lady did die from a broken neck. It is possible that a person feeling another's pulse may mistakenly feel a pulsebeat after death because "the person that's trying to feel the pulse themselves are excited and their heart beats stronger or faster, more or less, and that in trying to obtain sensation of the pulsation, they feel their own pulse action—their heart's beating faster and throwing more blood out into their fingers."