639 F.2d 415
 Andrew PUTMAN and Donald Favors, Appellants,
v.
Elmer GERLOFF, Sheriff, Individually and Collectively in the
Official Capacity; Jim Crowe, Deputy Sheriff,
Individually and Collectively in the
Official Capacity, Appellees.
 No. 80-1202.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 17, 1980.
Decided Jan. 28, 1981.
 
 Fred Boeckmann, Clayton, Mo., for appellants.
 Walter D. McQuie, Jr., Montgomery City, Mo., for appellees.
 Before LAY, Chief Judge, HENLEY, Circuit Judge, and HARRIS,* Senior District Judge.
 LAY, Chief Judge.
 
 
 1
 Andrew Putman and Donald Favors appeal from a judgment denying plaintiffs damages for alleged deprivation of their civil rights under 42 U.S.C. § 1983.[1] The authorities sued were Elmer Gerloff, Gasconade County Sheriff, and James Crowe, who was Gerloff's deputy in 1976. The district court directed a verdict for the deputy, Crowe, and thereafter submitted plaintiffs' case against the sheriff to the jury. The jury returned a verdict for the defendant, and this appeal followed. Error is claimed in directing a verdict in favor of Crowe and in giving certain jury instructions. Putman also asserts that the court erred in denying him a directed verdict against Gerloff for an admitted battery on his person. We vacate the judgment below and remand the entire proceedings for a new trial.
 
 
 2
 On June 29, 1976, both Putman and Favors were being detained in the Gasconade County jail in Hermann, Missouri, awaiting trial on charges of armed robbery. The jail facilities in Hermann consisted of one large cell which had two smaller cells within its confines. The plaintiffs, having obtained hacksaw blades, began sawing bars in the large cell which protected a 12 x 14 door used to pass food to the prisoners. The food door was four to four and one-half feet above the ground. Dispatchers in the building heard the noise and notified Sheriff Gerloff and Deputy Crowe that they feared an escape attempt. Gerloff and Crowe approached the cell area and waited out of sight. Favors then crawled through the space. Thereafter Putman, a larger man, attempted to crawl through. He became stuck in the opening, flat on his back with his face toward the ceiling. Crowe and Gerloff testified that they waited until they heard noises indicating that someone hit the floor. Then they entered.
 
 
 3
 The parties varied in their descriptions of the subsequent occurrences.
 
 
 4
 (a). Crowe. Deputy Sheriff Crowe testified they found Favors in the hallway and Putman stuck in the door. Favors volunteered to go back in but had no way to get back. Crowe told him to "hit the floor", and he did. Then Crowe said one or two Hermann police officers joined them and he handcuffed Favors. Meanwhile, Gerloff was trying to help Putman back through the hole. Crowe claimed he never saw Gerloff strike Putman.
 
 
 5
 (b). Gerloff. Sheriff Gerloff's testimony was similar except with regard to his dealings with Putman. Gerloff testified:
 
 
 6
 When I went up to Mr. Putman, he was in the door. Knowing his past record and knowing that he had hacksaw blades passed to him, I did not know what else he had passed to him. I had to get his attention. I took the butt of my shotgun and I struck Mr. Putman in the top of his head.
 
 
 7
 (c). Favors. Favors claimed all four officers entered at once, with shotguns pointed at them. He said Gerloff said "I ought to blow your head off," and that Favors put his hands up and said he gave up. He claimed Gerloff then grabbed him by the hair of his head and threw him to the floor. While he was on the floor an unknown, non-uniformed individual kicked him in the side. He did not believe Crowe saw the kicking incident. While this was going on, he could see Gerloff beating Putman with his shotgun "seven or eight times". He said Crowe was standing next to Gerloff while this occurred.
 
 
 8
 (d). Putman. Putman testified Gerloff said, "I got you now", and he said, "Okay, we give up." Gerloff said, "You damn right you do," and hit him on the head two or three times with his gun. He claimed he passed out after a couple of blows and was pulled back into the cell by the other prisoners with assistance from Crowe. Gerloff then ordered him to lie on the floor, and he did.
 
 
 9
 Overnight Chaining and Handcuffing.
 
 
 10
 Crowe handcuffed both prisoners with their hands behind their backs. Crowe said "leg iron cuffs" were then used to chain the two together. He described these as a set of cuffs with a chain of 12 to 16 inches between the shackles. He said the prisoners' legs were not shackled, but he did not specify where the cuffs were attached. Gerloff and Crowe were both vague about who did the chaining, although Gerloff testified "we handcuffed them together we used a belly chain, or it might be called a leg iron, that we used and chained them together It left them about a foot movement between them. Maybe 18 inches." (emphasis added.) The prisoners were then placed in one of the small cells. They were locked in this cell overnight from around 7 or 8 P.M. until 7 or 8 A.M., by Favors' estimate. Favors claimed that he and Putman were forced to remain sitting up all night and could not sleep. Putman claimed the handcuffs and chains kept him from using the toilet and that he urinated in his pants. However, Crowe said when he came to get them the next morning he noticed no odor and there were no complaints about access to the toilets. Similarly, a Missouri Highway Patrolman came to the jail the next morning to help search the prisoners, and noticed no indication Putman had "defecated" in his clothes. He also observed no bruises, cuts, or marks of violence.
 
 
 11
 The following day, Putman complained of a headache and requested medical attention. He was taken to a local doctor, but the doctor's findings are not clear. He was not called as a witness at trial. His medical report was entered into evidence, and it refers to the presence of a hematoma. Putman complained at trial of continued headaches and dizziness.
 
 
 12
 I. Instructions on Section 1983 Liability for Assault and Overnight Chaining.
 
 
 13
 Plaintiffs' complaint alleged that they had been denied due process of law and subjected to cruel and unusual treatment as prohibited by the Eighth Amendment. Plaintiffs claim the court erred in requiring "too strong" a burden of proof as to what constitutes cruel and unusual punishment. In Instruction 6A, the court instructed as follows:
 
 
 14
 Your verdict must be for Defendant Sheriff Elmer Gerloff unless you find and believe from a preponderance of the evidence that said defendant:
 
 
 15
 1. subjected either Plaintiff to an attack of such base, inhumane and barbaric proportions so as to shock and offend your sensibilities, or
 
 
 16
 2. in placing Plaintiffs in a cell chained with their hands behind them subjected them to treatment which offends contemporary concepts of decency and human dignity and violates standards of good conscience and fundamental fairness.
 
 
 17
 We deem the overall instructions confusing and erroneous. In combination the court's instructions state various theories, standards and defenses which are not necessarily consistent. Instruction No. 11 charges that individuals are protected from punishment prior to trial, but Instruction 6A says rights are violated only if the punishment is base, inhumane and barbaric. The final instruction says that officers could use only that force which appeared reasonable under the circumstances.
 
 
 18
 We agree that the plaintiffs were subjected to an erroneous burden of proof. The fundamental error is the requirement that plaintiffs prove that the defendants' conduct amounted to cruel and unusual punishment. Putman and Favors were pretrial detainees, not prisoners convicted of crimes. In Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Court expressly noted that:
 
 
 19
 Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be "cruel and unusual" under the Eighth Amendment. The Court recognized this distinction in Ingraham v. Wright, 430 U.S. 651, 671-672, n.40 (97 S.Ct. 1401, 1412-1413, n.40, 51 L.Ed.2d 711) (1977):
 
 
 20
 " (T)he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment."
 
 
 21
 Id. at 535, n.16, 99 S.Ct. at 1872, n.16.
 
 
 22
 See also Campbell v. Cauthron, 623 F.2d 503 (8th Cir. 1980). Thus, references in Instructions 3 and 6 to "cruel and unusual punishment" are improper. Similarly, insofar as the standards stated in Instruction 6A are drawn from Eighth Amendment cases such as Burns v. Swenson, 430 F.2d 771 (8th Cir. 1970), cert. denied, 404 U.S. 1062, 92 S.Ct. 743, 30 L.Ed.2d 751 (1972), and Holt v. Sarver, 442 F.2d 304 (8th Cir. 1971), they are in error. These instructions effectively immunized the defendants from liability for all but punishment that was cruel and unusual, while Bell teaches that "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." Id. 441 U.S. at 535, 99 S.Ct. at 1872. (emphasis added, footnote omitted).[2]
 
 
 23
 A. Standard for the Overnight Chaining and Handcuffing.
 
 
 24
 Bell v. Wolfish was a class action seeking injunctive relief for various conditions to which pretrial detainees were subjected, including double-bunking, strip-searches, and various security measures. Plaintiffs here seek damages for being chained and handcuffed for approximately 12-13 hours and deprived of access to toilet facilities.
 
 
 25
 Bell states that "the proper inquiry is whether (the) conditions amount to punishment of the detainee." Id. at 535, 99 S.Ct. at 1872 (footnote omitted). To distinguish between punitive measures and permissible regulatory measures, the Court said:
 
 
 26
 A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. See Flemming v. Nestor, (363 U.S. 603,) at 613-617 (80 S.Ct. 1367, at 1374-1376, 4 L.Ed.2d 1435) ((1960)) (I)f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal if it is arbitrary or purposeless a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.
 
 
 27
 Id. at 538-39, 99 S.Ct. at 1873-1874 (footnotes omitted).
 
 
 28
 Among the legitimate objectives are ensuring a detainee's presence at trial and interests "that stem from (the Government's) need to manage the facility in which the individual is detained." These include "steps to maintain security and order " Id. at 540, 99 S.Ct. at 1874.
 
 
 29
 In other words, the jury could find that the defendants' conduct was punishment on the basis of direct evidence of intent to punish, or it could infer that the purpose was punishment from the fact that the condition either bore no reasonable relation to a legitimate goal or exceeded what was necessary for attaining such a goal.[3] Cf. Romeo v. Youngberg, 644 F.2d 147 (3d Cir., 1980) (en banc) (recognizing liberty interest in freedom from shackling and using "compelling necessity" or "least restrictive manner" tests with respect to shackling of mentally retarded person). Thus, a proper instruction on the overnight chaining would have told the jury that as pretrial detainees, Putman and Favors had the right not to be punished. If the plaintiffs were chained overnight to be punished, they were then deprived of liberty without due process. The jury may find direct evidence of intent to punish, or it may infer that this intent existed if it finds that the overnight chaining was not reasonably related to insuring the presence of Putman and Favors at trial and preserving the security of the jail, or if those purposes could have been achieved by alternative and less harsh methods.[4]
 
 
 30
 B. Standard for Assault and Beating.
 
 
 31
 Instruction 11 properly informed the jury that there is a liberty interest in freedom from punishment through bodily injury. A large body of case law in other circuits recognizes that law enforcement officials may be liable under section 1983 for using excessive force in completing an arrest or for assaulting pretrial detainees.[5] The leading case, Johnson v. Glick, 481 F.2d 1028 (2d Cir.) (Friendly, J.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), stated a widely-accepted standard in such cases:
 
 
 32
 Certainly the constitutional protection is nowhere nearly so extensive as that afforded by the common law tort action for battery, which makes actionable any intentional and unpermitted contact with the plaintiff's person or anything attached to it and practically identified with it, see Prosser, Torts, § 9 (4th ed. 1971); In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.
 
 
 33
 Id. at 1033.
 
 
 34
 See also Bellows v. Dainack, 555 F.2d 1105, 1106 n.1 (2d Cir. 1977); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1079-80 (3d Cir. 1976) (recognizing right of pretrial detainees; restricting recovery to intentional acts); Jenkins v. Averett, 424 F.2d 1228, 1232 (4th Cir. 1970) (non-fatal shooting during arrest; section 1983 action for injuries arbitrarily inflicted); Williams v. Kelley, 624 F.2d 695, 697 (5th Cir. 1980) (applying Johnson v. Glick standard; finding for defendant on grounds actions were mere negligence); Hamilton v. Chaffin, 506 F.2d 904, 909 (5th Cir. 1975) (adopting Johnson standard); Lucarell v. McNair, 453 F.2d 836, 838 (6th Cir. 1972) (reversing dismissal); Hampton v. Hanrahan, 600 F.2d 600, 625 (7th Cir. 1979), cert. granted on other grounds and rev'd on other grounds, 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); Clark v. Ziedonis, 513 F.2d 79, 80 n.1 (7th Cir. 1975) (affirming judgment based on excessive force during arrest); Collum v. Butler, 421 F.2d 1257, 1259-60 (7th Cir. 1970) (affirming judgment for arrestee); Meredith v. Arizona, 523 F.2d 481, 483 (9th Cir. 1975) (assault on convicted prisoner; adopts Johnson v. Glick ); Gregory v. Thompson, 500 F.2d 59, 62 (9th Cir. 1974) (assault by justice of peace on person appearing in court); Morgan v. Labiak, 368 F.2d 338 (10th Cir. 1966) (affirming judgment for arrestee). Cf. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).[6]
 
 
 35
 Bell v. Wolfish supports an instruction in which the jury is told to evaluate the use of force in a manner similar to its evaluation of the overnight chaining. If Gerloff's purpose in striking Putman was to injure, punish or discipline him, the jury should find for the plaintiff. The jury may find direct evidence of improper purpose in Gerloff's statements or acts. It can also infer that this was an improper assault if force was unnecessary or if the force used exceeded the force reasonably justified under the circumstances. Furthermore, as an affirmative defense both Gerloff and Crowe may claim qualified immunity if their official actions were taken in good faith. Under Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), immunity must be granted unless the officer:
 
 
 36
 knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the (person) affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the (person).[7]
 
 
 37
 Id. at 322, 95 S.Ct. at 1001.
 
 
 38
 Under these standards, we find no error in the district court's refusal to grant Putman a directed verdict against Gerloff. Taken in the light most favorable to Gerloff, the testimony shows that when Gerloff struck Putman he used the rubber-padded butt of his shotgun to "get his attention." It is true Putman was stuck in the door. Although there was no testimony that Putman had any weapon in his hands Gerloff was still apprehensive since the prisoners had acquired hacksaws and he did not know what else they might have.
 
 
 39
 Reasonable minds might differ as to the reasonableness of Gerloff's conduct under these circumstances and Gerloff's good faith. The record is vague as to how hard a blow he struck, and whether Gerloff struck Putman once or several times is, of course, a question of fact for the jury to determine. A jury could find that Gerloff reacted to the danger of a successful escape by using reasonable force to convince Putman that Gerloff was in control and that he should not attempt to resist his authority. On the other hand a jury could find that Gerloff was acting maliciously or intended to punish Putman unlawfully. In such a case he would not be acting in good faith and would be liable. In any event we hold the issue to be one of fact under all the existing circumstances.
 
 
 40
 Plaintiffs also urge that the trial court failed to instruct that their armed robbery convictions should not affect the jury's determination. They requested the following instruction:
 
 
 41
 Whether the plaintiffs were guilty of a crime at the time of the occurrences testified to in this proceeding is entirely irrelevant and is not to be considered by you in any way in reaching your verdict in this case.
 
 
 42
 We find no apparent prejudice in the refusal to give the requested instruction since the court essentially covered the subject area in different language.[8]
 
 
 43
 II. Directed Verdict for Crowe.
 
 
 44
 Plaintiffs' final argument relates to the directed verdict in favor of Crowe.
 
 
 45
 A. Chaining and Handcuffing.
 
 
 46
 The testimony showed that Crowe placed handcuffs on Putman and Favors. Further, he participated in putting Putman and Favors in the cell and may have been involved in chaining them together. Finally, Crowe was the individual in charge of daily operations at the Hermann jail, since he lived in Hermann. Sheriff Gerloff lived in Bland, approximately 40 miles away.
 
 
 47
 As discussed supra, the doctrines in Bell v. Wolfish would permit the jury to conclude that there was a deprivation of liberty without due process if it found that the chaining and handcuffing constituted "punishment." If the jury made this finding, Crowe could be liable and a directed verdict was improper.
 
 
 48
 Crowe's argument is that he was acting under the direction and supervision of Sheriff Gerloff. However, there are flaws in this as a ground for a directed verdict. The fact that the actions are taken pursuant to orders and instructions is not a defense in and of itself, although it may be relevant to a claim of good faith and the defense of qualified immunity. In Forsyth v. Kleindienst, 599 F.2d 1203 (3d Cir. 1979), petition for cert. filed, 48 U.S.L.W. 3481 (Jan. 29, 1980), defendant FBI agents claimed immunity on a theory of derivative immunity and on the theory that they were following orders of a superior. The court denied derivative immunity and held that if the agents "acted in 'good faith' in following the instructions of their superiors, then they will prevail On the other hand, if they knew or should have known that their actions were violating the plaintiffs' constitutional rights, then they will not be allowed to hide behind the cloak of institutional loyalty." Id. at 1217. In other words, the defendants could claim qualified "good faith" immunity, but could not claim separate and additional immunity based solely on the fact that they were following instructions. In this case, Crowe could claim good faith action in reliance on Gerloff's orders, if any. However, the jury could find that Crowe lost his immunity here if it found he knew or should have known that he was violating plaintiffs' constitutional rights or that he had a malicious intention to deprive the plaintiffs of their constitutional rights or to cause them other injuries. Thus, the case against Crowe with respect to the chainings should have been submitted to the jury along with an instruction on the availability of the good faith defense.
 
 
 49
 B. Failure to Intervene in the Beating of Putman.
 
 
 50
 The record also contains sufficient evidence, particularly Favors' testimony, from which the jury could have concluded that Crowe was present and saw Gerloff hit Putman with his gun several times and that Crowe either did nothing to stop this assault or eventually tried to push Putman back through the hole.
 
 
 51
 The leading case with respect to the duty to intervene is Byrd v. Brishke, 466 F.2d 6 (7th Cir. 1972). In Byrd, the court held that police officers who ignored assaults by other officers could be liable under section 1983.
 
 
 52
 We believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge. That responsibility obviously obtains when the nonfeasor is a supervisory officer to whose direction misfeasor officers are committed. So, too, the same responsibility must exist as to nonsupervisory officers who are present at the scene of such summary punishment, for to hold otherwise would be to insulate nonsupervisory officers from liability for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace. Accordingly, the plaintiff was entitled to have his case against defendants Moran, Pfeiffer and Finnin submitted to the jury upon his having offered testimony that he was beaten by unknown officers in their presence.
 
 
 53
 Id. at 11.
 
 
 54
 See also Hampton v. Hanrahan, 600 F.2d at 626 (presence during beatings and abuse); Harris v. Chanclor, 537 F.2d 203, 206 (5th Cir. 1976) (supervisor's failure to intervene); Jennings v. Davis, 476 F.2d 1271, 1275 (8th Cir. 1973) (recognizing possible duty to intervene, but granting summary judgment based on uncontradicted affidavit officer was unable to intervene); Wilkinson v. Ellis, 484 F.Supp. 1072, 1085 (E.D.Pa.1980) (failure of assistant prosecutors to intervene with police officers).
 
 
 55
 In this case, Crowe is charged with the duty to intervene with his superior, Gerloff, who was hitting the prisoner. The language from Byrd makes it clear that officers are expected to intervene but does not explicitly deal with the problem of a subordinate's duty to intervene with his superior. We conclude although Crowe was a subordinate the evidence is sufficient to hold him jointly liable for failing to intervene if a fellow officer, albeit his superior, was using excessive force and otherwise was unlawfully punishing the prisoner. On the other hand if the jury believes that Gerloff did not violate Putman's rights, or that Crowe did not see Gerloff hitting Putman or have time to reach Gerloff, Crowe would not be responsible. We hold that the trial court erred in failing to submit Crowe's liability to the jury.
 
 
 56
 III. Conclusion.
 
 
 57
 We conclude that the trial court erred by placing too great a burden on the plaintiffs. A sheriff does not have authority to punish a person in the process of arresting him or after placing him in custody, or to otherwise use excessive and unreasonable force. The grant of a directed verdict for the defendant Crowe was also error. Because of these errors the cause is ordered remanded as to both defendants.
 
 
 58
 The judgment in favor of the defendants is vacated and the cause is remanded for a new trial as against both defendants.
 
 
 
 *
 Oren Harris, Senior District Judge, Eastern and Western Districts of Arkansas, sitting by designation
 
 
 [1]
 Although the complaint alleges a claim for relief under both section 1983 and section 1985, the trial court properly dealt with this solely as a section 1983 claim. A claim under section 1985(3) must allege a class-based animus. Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The complaint does not allege any such animus. Photographs taken at the scene suggest that Putman and Favors are white males
 
 
 [2]
 Gerloff and Crowe argue that any error in Instruction 6A was waived by plaintiffs' failure to object. The record shows that plaintiffs' counsel objected to Instruction 6A, but it does not show what grounds, if any, were asserted. Although the recorded objection lacks the specificity contemplated by Fed.R.Civ.P. 51, we feel the submission of the case under Eighth Amendment standards constituted plain error seriously affecting the fairness of the proceeding. See Luster v. Retail Credit Co., 575 F.2d 609, 618 (8th Cir. 1978); Horace v. St. Louis Southwestern R. R., 489 F.2d 632, 634 (8th Cir. 1974)
 
 
 [3]
 In Bell the Court noted:
 Retribution and deterrence are not legitimate nonpunitive governmental objectives Conversely, loading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish.
 Id. at 539, n.20, 99 S.Ct. 1874 n.20 (emphasis added).
 
 
 [4]
 There is clearly an issue for the jury as to less harsh methods. It is arguable the prisoners could have been secured for the night by simply searching them for hacksaw blades and then locking them in the small cell. It is further obvious that tighter security could have been achieved by placing a guard outside the damaged cell
 
 
 [5]
 Assaults on arrestees or pretrial detainees by police officers have also been grounds for criminal prosecutions for deprivation of constitutional rights under 18 U.S.C. § 242. See, e. g., Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); United States v. Fleming, 526 F.2d 191 (8th Cir. 1975), cert. dismissed, 423 U.S. 1082, 96 S.Ct. 872, 47 L.Ed.2d 93 (1976); United States v. Stokes, 506 F.2d 771 (5th Cir. 1975)
 
 
 [6]
 Although it has frequently addressed conditions for convicted prisoners, the Eighth Circuit has never expressly addressed the issue of section 1983 protection for pretrial detainees or arrestees from assault or excessive force. However, several cases recognize that when excessive force results in death, it is a deprivation of a fundamental right without due process. See Landrum v. Moats, 576 F.2d 1320, 1325 (8th Cir.), cert. denied, 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978); Mattis v. Schnarr, 547 F.2d 1007 (8th Cir. 1976) (en banc) vacated as moot sub nom. Ashcroft v. Mattis, 431 U.S. 171, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977); Russ v. Ratliff, 538 F.2d 799 (8th Cir. 1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977). There was implicit recognition of a cause of action for beatings and assault in Linn v. Garcia, 531 F.2d 855 (8th Cir. 1976) (affirming judgment for section 1983 plaintiff based upon beatings by police officer.) See also United States v. Fleming, 526 F.2d 191 (8th Cir. 1975), cert. dismissed, 423 U.S. 1082, 96 S.Ct. 872, 47 L.Ed.2d 93 (1976); Agee v. Hickman, 490 F.2d 210 (8th Cir.), cert. denied, 417 U.S. 972, 94 S.Ct. 3178, 41 L.Ed.2d 1143 (1974) (force was reasonable and necessary); Jennings v. Davis, 476 F.2d 1271 (8th Cir. 1973) (various defendants not responsible for the alleged assault)
 Cole v. Smith, 344 F.2d 721 (8th Cir. 1965), cited by Johnson v. Glick as the sole case contrary to finding a cause of action for prison discipline, is not controlling here. It is distinguishable as it involved a convicted prisoner. Further, it is of questionable authority in light of more recent decisions in this circuit involving prison discipline.
 
 
 [7]
 In Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), the Court expanded on this standard:
 Under the first part of the Wood v. Strickland rule, the immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right, and if they knew or should have known that their conduct violated the constitutional norm.
 (T)he second branch of the Wood v. Strickland standard would authorize liability where the official has acted with "malicious intention" to deprive the plaintiff of a constitutional right or to cause him "other injury." This part of the rule speaks of "intentional injury," contemplating that the actor intends the consequences of his conduct.
 Id. at 562, 566, 98 S.Ct. at 860, 862.
 See also Landrum v. Moats, 576 F.2d 1320 (8th Cir.), cert. denied, 439 U.S. 912, 99 S.Ct. 282, 58 L.Ed.2d 258 (1978).
 
 
 [8]
 The court instructed:
 This case should be considered and decided by you as an action between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. The law is no respector of persons: all persons stand equal before the law, and are to be dealt with as equals in a court of justice.
 Even a person under arrest has certain liberties that cannot be taken from him, including the liberty to be free from unlawful attacks on his physical being. It has always been the policy of the law to protect the physical integrity of every person from unauthorized violation or interference. So these Plaintiffs, while under arrest had the right under the Federal Constitution to not be deprived of this remaining liberty without due process of law.