Cary Nelson **REHBEIN**, Plaintiff,

v.

Charles **TERRY**, et al., Defendants.

No. CV88–L–103.

United States District Court,
D. Nebraska.

Dec. 7, 1992.

John Hoffert, Knudsen, Berkheimer Law Firm, Lincoln, NE, for plaintiff.

Michael Amdor and Edwin Lowndes, Douglas County Atty's Office, John Hartigan and Raymond E. Walden, Kennedy Holland, Omaha, NE, William Shreffler, Louisville, KY, for defendants.

## MEMORANDUM ON APPEAL FROM JUDGMENT BY MAGISTRATE JUDGE

URBOM, Senior District Judge.

### BACKGROUND

The defendant Louis Martin, M.D., by a judgment entered by Magistrate Judge David L. Piester on April 7, 1992, was held liable for allowing physical restraints to be kept on the plaintiff for some 39 hours while the plaintiff was confined as a pretrial detainee at the Douglas County Hospital. All claims, except the one at issue here, were resolved against the plaintiff. Judgment was for $7,500 in damages and $21,025.82 in attorney's fees and expenses. I now reverse the judgment and dismiss the case.

Trial was before the magistrate judge by consent of the parties and appeal by their consent was to a district judge. Appeal, according to 28 U.S.C. § 636(c)(4) is "on the record ... in the same manner as on an appeal from a judgment of the district court to a court of appeals." Accordingly, findings of fact are to be accepted unless "clearly erroneous." Findings are clearly erroneous "if, in consideration of the entire record, the appellate court is left with the definite and clear conviction that a mistake has been made." *Propst v. Leapley,* 886 F.2d 1068, 1070 (8th Cir.1989). Fully appreciative of the fact that the magistrate judge saw and heard the witnesses testify, I nonetheless am left with the definite and clear conviction that a mistake has been made. I also conclude that an erroneous legal standard was applied.

The facts as found by the magistrate judge in his memorandum opinion, as they relate to the Douglas County Hospital incident, are carefully described. The critical times are from about 6:00 p.m. on November 22, 1982, to about 9:00 a.m. on November 24, 1982. Restraints—five point restraints—began at approximately 6:00 p.m. on November 22 and the magistrate judge found that the initiation of those restraints was proper.

On the other hand, the magistrate judge found the continued use of restraints—gradually reduced from five-point to one-point—to have been violative of the standard he

applied. In arriving at that conclusion the magistrate judge quoted *Putman v. Gerloff,* 639 F.2d 415, 420 (8th Cir.1981). The standard there used was:

> "Thus, a proper instruction on the overnight chaining would have told the jury that as pretrial detainees, Putman and Favors had the right not to be punished. If the plaintiffs were chained overnight to be punished, they were then deprived of liberty without due process. The jury may find direct evidence of·intent to punish, or it may infer that this intent existed if it finds that the overnight chaining was not reasonably related to insuring the presence of Putman and Favors at trial and preserving the security of the jail, or if those purposes could have been achieved by alternative and less harsh methods."

## LEGAL STANDARD

The standard applicable when medical professional decisionmakers are determining when restraints are proper is articulated in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), which involved a mentally retarded person who was involuntarily committed to a state institution. The Court held that under the due process clause of the Fourteenth Amendment a person so confined has a protected liberty interest in freedom from unreasonable bodily restraints and to reasonably safe conditions of confinement, as well as entitlement to minimally adequate training. The Court said:

> "In Chief Judge Seitz' view, the Constitution 'only requires that the courts make certain that professional judgment in fact was exercised.' ... He concluded that the appropriate standard was whether the defendants' conduct was 'such a substantial departure from accepted professional judgment, practice, or standards in the care and treatment of this plaintiff as to demonstrate that the defendants did not base their conduct on a professional judgment.' ..."

*Id.* at 314, 102 S.Ct. at 2457.

> "We think the standard articulated by Chief Judge Seitz affords the necessary guidance and reflects the proper balance between the legitimate interests of the State and the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraints. He would have held that 'the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.' [*Romeo v. Youngberg*] 644 F.2d [147], at 178 [(3rd Cir.1980)]. Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish. Cf. *Estelle v. Gamble,* 429 U.S. 97, 104 [97 S.Ct. 285, 291, 50 L.Ed.2d 251] (1976). At the same time, this standard is lower than the 'compelling' or 'substantial' necessity tests the Court of Appeals would require a State to meet to justify use of restraints or conditions of less than absolute safety. We think this requirement would place an undue burden on the administration of institutions such as Pennhurst and also would restrict unnecessarily the exercise of professional judgment as to the needs of residents.

> Moreover, we agree that respondent is entitled to minimally adequate training. In this case, the minimally adequate training required by the Constitution is such training as may be reasonable in light of respondent's liberty interests in safety and freedom from unreasonable restraints. In determining what is 'reasonable'—in this and in any case presenting a claim for training by a State—we emphasize that courts must show deference to the judgment exercised by a qualified professional. By so limiting judicial review of challenges to conditions in state institutions, interference by the federal judiciary with the internal operations of these institutions should be minimized. Moreover, there certainly is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions. See *Parham v. J.R., supra* [442 U.S. 584], at 607 [99 S.Ct. 2493 at 2506, 61 L.Ed.2d 101 (1979)]; *Bell v. Wolfish, supra* [441

U.S. 520], at 544 [99 S.Ct. 1861 at 1877, 60 L.Ed.2d 447 (1979)] (Courts should not ·'second-guess the expert administrators on matters on which they are better informed'). For these reasons, the decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment ..."

*Id.* at 321, 323, 102 S.Ct. at 2461, 2462. By footnote the Supreme Court then says: "By 'professional' decisionmaker, we mean a person competent, whether by education, training or experience, to make the particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded. Of course, day-to-day decisions regarding care—including decisions that must be made without delay—necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons."

*Id.* at 323, n. 30, 102 S.Ct. at 2462, n. 30.

That the standard with respect to "training" was meant to apply to use of restraints is demonstrated by the Supreme Court a page later when it says:

"Respondent thus enjoys constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests.... In determining whether the State has met its obligations in these respects, decisions made by the appropriate professional are entitled to a presumption of correctness. Such a presumption is necessary to enable institutions of this type—often, unfortunately, overcrowded and understaffed—to continue to function. A single professional may have to make decisions with respect to a number of residents with widely varying needs and problems in the course of a normal day. The administrators, and particularly professional personnel, should not be required to make each decision in the shadow of an action for damages."

## ANALYSIS OF THE EVIDENCE

An extension of that standard to mentally ill persons was established in *Washington v. Harper*, 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990), where the Court cautioned against replacing medical judgment with judicial judgment and rebutted the dissent of Justice Stevens by saying that the dissent " 'discount[s]' ... the deference that is owed to medical professionals who have the full-time responsibility of caring for mentally ill inmates ... and who possess, as courts do not, the requisite knowledge and expertise to determine whether the drugs should be used in an individual case...." *Id.* at 230-1, n. 12, 110 S.Ct. at 1041-42, n. 12.

■ The first issue, then, in the present case has to be whether the decision regarding the retention of restraints over the period of time plaintiff was under restraint was made "by a professional."

The magistrate judge said that defendant Martin's professional judgment was not exercised. "To the contrary," said the magistrate judge, "the evidence shows that Dr. Martin merely deferred to the judgments of subordinates, and did not himself reevaluate plaintiff's situation to consider reasons for continuing the restraints, or alternatively, eliminating them." (Memorandum Opinion p. 22, filing 135).

The problem is that there is simply no evidence to support that conclusion. Repeated testimony throughout the trial was that the decision to restrain was made by a team, including Dr. Martin. A verbal order was given by Dr. Martin to Registered Nurse J. Taylor on November 22, "May use restraints for agitated behavior for 24 [hours] as needed." Dr. Martin signed the nurse's entry of that verbal order. On November 23 Dr. Martin entered a written order, "Continue restraints if needed to control behavior." On November 24 he wrote a progress note following the 11:00 p.m. to 7:00 a.m. shift of

November 23–24, "Continues to require restraints," and he wrote an order, "Continue restraints if needed to control behavior." There is no evidence of any kind that those entries are false or that they did not involve any professional judgment on Dr. Martin's part. Nor can Dr. Martin be chastised for "defer[ring] to the judgments of subordinates." (Memorandum Opinion, p. 22, filing 135). No testimony by anyone implies that a psychiatrist cannot properly rely upon the input of other professionally trained persons. The Supreme Court's explicit description of "professional decisionmaker" includes, as far as long-term treatment decisions are concerned, "persons with degrees in ... nursing" and as to day-to-day decisions "employees without formal training but who are subject to the supervision of qualified persons." *Youngberg v. Romeo, supra,* 457 U.S. at p. 323, n. 30, 102 S.Ct. at p. 2462 n. 30. Conferences with his staff were held each morning at about 10:00 a.m., where input from the rest of the staff was received (Tr. 302–303). Dr. Martin's testimony was:

> "I would have continued to talk daily or actually several times a day over with the staff how is Mr. Rehbein doing. And I believe on the 23rd I went down and evaluated him directly."

*Id.* 124:13–16. It cannot be inferred from that or any other evidence in the record that Dr. Martin failed to exercise any professional judgment.

The medical standard as to the length of time physical restraints should be used upon a patient was expressed by no witness other than Dr. Martin. The magistrate judge characterized the testimony regarding medical standards as follows:

> "The professional standards governing the use of restraints were well established by the testimony of defendant Martin, the deposition of defendant Bergstrom, and the consent form signed by the plaintiff: Restraints were to be used as a means of last resort, in order to protect the patient from harming himself and others. Dr. Martin sought to supplement this standard by asserting that the restraints established limits and an expression of the staff's concern for the patient's well-being; encour-

aged the patient to adopt more appropriate conduct; and conveyed the message that the physician will invoke authority." (Memorandum of Opinion, pp. 19–20, filing 135). These "supplemental" assertions were discredited by the magistrate judge as being "specious." The discrediting was not on the basis of any medical evidence; there was no such medical evidence. The error probably arose from the magistrate judge's view that restraints were to be used only as long as necessary to provide the patient and others with immediate safety from harm and therefore had to be discontinued as soon as the patient showed signs of calmness and self-control. The view assumes that restraints have no employable therapeutic value. The only medical testimony was to the contrary.

It is uncontradicted that the plaintiff suffered from mental illness with a psychiatric diagnosis of anti-social personality and dysthymic disorder and was in need of treatment, as opposed to mere control.

The deposition testimony of Helen M. Bergstrom did not eliminate psychological benefits of continued restraints. Indeed, she offered the opinion, after reviewing the records, "I don't believe Dr. Martin did anything wrong." (Plaintiff's Exhibit 8, 48:12–13). Dr. Martin's testimony never limited the goals of restraints to protecting the patient from harming himself and others without regard to psychological effects of restraints maintained beyond the moment when calmness and apparent self-control appeared. When asked in the plaintiff's case-in-chief for the purpose of a physical restraint with respect to any potentially suicidal patient, he said:

> "The primary purpose in using restraints is to control the physical activity so as to make direct action impossible. There are secondary psychological intents. Frequently patients who are uncontrollably aggressive either towards themselves or towards others are aware on some level of their loss of controls.
>
> And the establishment of physical restraints not infrequently is of direct psychological benefit in establishing, even if involuntarily, a clear set of limits for the patient so that, for instance, not atypically,

although grantedly unusually, severely disturbed patients who have received psychiatric treatment before may even identify a psychological need to be in restraints because they realize they're out of control.

So the purpose of using restraint bridges the areas from direct physical control of potentially destructive behavior to and including the beneficial psychological results that may come from judicious use of restraint."

(Tr. 97:15–98:8).

Testimony of Dr. Martin on direct examination in the defendant's case included this:

". . . I reauthorized or reordered actually the continuation of the restraint on [an] as-needed basis the two following days on the 23rd and on the 24th which means that I reviewed that status of the case, the status of the patient, and the status of the progress, and gave those orders because of a continuing clinical need because of an assessment on my part that it was still a dangerous situation."

(Tr. pp. 123–124).

Dr. Martin also testified in response to a question as to what justification he believes there was for an approximately 37–hour period of restraint:

"The first thing that I'd say, with this kind of a history of continuing suicidality on the part of a patient that a day or two or possibly even three would be an appropriate period of time to keep a person restrained for evaluation fairly much irrespective of his behavior during that period of time. . . .  Once you make the clinical conclusion that restraint is required, there is a certain amount of time when you need to stick with the decision to do it for it to be capable of being evaluated as a clinical intervention."

(Tr. 126:12–23).

When asked whether a working-out-of-restraints process is a normal one, Dr. Martin testified:

"That's the way we usually do it.  There are times when the patient has been restrained, and the doctor simply goes in in making rounds and makes the decision that, for instance, this patient seems well enough to me to let him out of restraints or her out of restraints and see how he or she does.

On the other hand, it's a typical or frequently used procedure to allow the patient out of restraints one member at a time until he's completely free."

(Tr. 130:20–131:3).

When asked for his opinion as to whether the restraints applied to Mr. Rehbein between November 20 and November 24 were proper, Dr. Martin was permitted to state:

"My opinion after reading [the medical records] is that the use of restraints at that time was medically necessary, that . . . faced with the same conditions sitting here today, I would order the same things and follow their application and gradual removal over an appropriate time in just the same way."

(Tr. 169:8–13).

In his direct examination in the defendants' case Dr. Martin testified as to the standard of care in Omaha, Nebraska, in the fall of 1982:

"That given the context of hospitalization that at a moment in time, on the basis of clinical evaluation, a patient is deemed because of some mental illness to be sufficiently agitated and/or dangerous, that no lesser level of treatment will be effective in order to maintain safety and to move gradually towards appropriate and assigned treatment modalities."

(Tr. 155:12–18).

Restraints, he said, would be justified in those circumstances.

On cross-examination Dr. Martin testified as follows:

Q. I take it it's your philosophy and belief that no one ought to be kept in restraints any longer than necessary. Is that a fair statement?

A. That's a fair statement.  I've already testified that cessation of the exact symptomatology for which you begin restraints isn't necessarily in time co-terminal with the necessity to be in restraints.

Q. Right. In fact, you indicated you might indeed keep someone in restraints for a period of a couple hours after the cessation of that offensive behavior.

A. For a period of time that I would view to be a matter of medical judgment, and I really couldn't define it outside the facts of an individual case to a specific time frame.

Q. Right. But generally a period of a couple hours is your practice or has been your practice?

A. Depending on the case.

Q. Right. Would you agree with me, sir, that it's a rare instance to keep someone in restraints longer than 24 hours?

A. No.

Q. You're saying that would not be a rare case?

A. I wouldn't say it would be rare. As our medications have improved and as other things have improved, keeping people in restraints for longer periods of time than 24 hours I'd characterize as unusual, but I'm not sure I'd go so far as to characterize it as rare."

(Tr. 210:12–211:12).

Again Dr. Martin testified:

"And I would again emphasize that surface disappearance of the acute reasons why to begin restraints are not the sole discriminatories as to when to stop restraints, if and when they disappear."

*Id.* 214:16–19.

Shortly thereafter Dr. Martin testified:

"So if you're looking at the universe of restrained patients, some patients in well-run facilities by experienced expert psychiatrists are, in point of fact, kept in restraints for days and even sometimes weeks."

*Id.* 226:4–7.

He further testified:

"In order to have any kind of therapeutic effects, it's necessary to establish some kind of meaningfulness in the establishment of any kind of therapeutic modality. If a patient says he needs to be on a medication, and you put him on a medication, and the next day he says I changed my mind, I don't want to be on the medication.

You know, my inclination is to say wait, we don't make medical decisions that way. This a decision we made; we made it after consideration; we've got to ride with the decision a long enough period of time that reversing the decision makes some sort of human and medical sense."

*Id.* pp. 229:20–230:6.

Asked whether he testified that the use of restraints is necessary and serves a reasonable therapeutic purpose, Dr. Martin said that he did not disagree with that statement. *Id.* 230:21–231:14. Dr. Martin was asked for his opinion of the reasonableness of keeping Mr. Rehbein in restraints for 37 hours and he answered, that use of the restraints for 37 hours was reasonable. *Id.* 235:19–236–12.

Dr. Martin identified what the magistrate judge characterized as "but euphemistic expressions for exerting continued physical control." (Memorandum of Opinion, p. 20, filing 135). Goals which Dr. Martin considered to be therapeutic were: Establishing for the patient a level of limit setting; an expression of concern by the staff in his well being; encouragement to the patient to explore more adaptive means of communicating and dealing with problems; and communicating with the patient that the staff will invoke authority. That keeping restraints on for a period of time serves those same therapeutic purposes was agreed with by Dr. Martin, who then said:

"But I'd also want to steer back into the process of making the decision to put on restraints in the first place, that there's a certain internally controlled quality of the nature of using restraints that if everything leads you to use them, your training and your experience with it also tells you that you need to use it for an effective period of time. Otherwise, you shouldn't have started it in the first place."

Tr. 265:17–25.

The reference by the magistrate judge to the deposition of the defendant Bergstrom in establishing the professional standards has to

do, apparently, with her identification of the hospital's written policies, Exhibit 3. Those policies say, "Restraints are used *only* as a last resort to protect the patient from harming himself and others." But that sentence is immediately preceded by a sentence emphasizing the therapeutic component of restraints:

> "The use of this procedure [restraints] should always be underscored by the idea of therapeutic gain for the patient."

Similarly, neither of the consent forms signed by the plaintiff on admission to the hospital forbids the use of physical restraints as treatment. Indeed, one form labeled "Request for Voluntary Psychiatric Hospitalization and Request for Treatment,"[1] says, "I understand that the treatment to be received ... may include ... physical restraint." Exhibit 1. The declaration in that form that such restraints will be used only to insure protection from "self harm to prevent that person from harming others" does not exclude treatment—therapeutic treatment—as a goal of restraints.

■ The record as a whole does not support the declaration that the appropriate medical standard is limited to retaining persons in restraints for only that period of time necessary to keep that person from hurting himself or others while or immediately after he is in restraints. The record, rather, indicates a therapeutic feature. The battleground in this case is not merely custodial, but custodial and medical. Intertwining requires a decision by medical professionals. Whether or not a judge considers that restraints have therapeutic value, the medical testimony in this case verifies that they do and none undercuts it. A professional decisionmaker made the decision about how long the restraints should remain on Cary Nelson Rehbein and the decision, therefore, is presumptively valid. Nothing in the record supports a finding that the decision was "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a

judgment." *Youngberg, supra,* at 323, 102 S.Ct. at 2462.

### CONCLUSION

Accordingly, despite my lofty respect for the magistrate judge, I must conclude that the judgment he entered was in error.

Because the evidence does not sustain a judgment for the plaintiff, the action will be dismissed.

---

1. The other form is titled "Authorization for Treatment" and was signed at the same time October 21, 1982, at 2:45 p.m. but does not mention restraints.