**Patricia E. McQURTER, Plaintiff,**

v.

**CITY OF ATLANTA, GEORGIA, et al., Defendants.**

**Civ. A. No. C79–1284A.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 13, 1983.

---

Elizabeth J. Appley, Margie Pitts Hames, Atlanta, Ga., for plaintiff.

Marva J. Brooks, W. Roy Mays, Atlanta, Ga., for defendants.

## ORDER

FORRESTER, District Judge.

This action brought under 42 U.S.C. §§ 1983 and 1988 for violations of the civil rights of Bennie McQurter was tried to the court without a jury from March 11–12, 1982 and from June 17–25, 1982. On June 23, 1982 the court granted the motions of defendants Lane and Davis for directed verdict. The plaintiff filed her proposed findings of fact and conclusions of law and memorandum on January 13, 1983, and the defendants filed their post-trial brief on February 23, 1983, to which plaintiff replied on March 14, 1983. Herein are the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

Around July 10, 1977 Bennie McQurter went to a tavern operated by R.S. Barber. He ordered a Coke and then fell asleep. Barber told him he could not sleep in the tavern. McQurter threw the coke and its can against the bar, cursed Barber, and left the tavern.

In about fifteen minutes McQurter returned and told Barber that he wasn't "going any goddamn place." Barber called the police.

On July 17, 1977 McQurter came back to the tavern. Barber recognized him as the man he had had the difficulties with earlier and ordered him out. McQurter again began cursing and acting wild. Barber again called the police. Officer K.D. Duncan of the Atlanta Bureau of Police Services ("ABPS") responded to the call and met McQurter at the tavern. McQurter was ordered off the premises. That was the end of the matter for that night.

On the following evening McQurter walked by the tavern again and told Barber he was going to kill him. Barber got his gun. McQurter started running toward Barber but tripped. He then repeated his intent to kill Barber and said that he was going to get him. The police again were called, and Officer Kenneth E. Burdette responded. Barber related the foregoing and described McQurter to Burdette.

Officer Duncan was also on duty that night and heard the call for help at the tavern. Over the radio he told Burdette something of his involvement the previous evening and gave Burdette a physical description of McQurter.

Burdette cruised the neighborhood in a patrol car until he saw a person fitting the description he had received from Barber and Duncan. He stopped McQurter and asked him to identify himself. McQurter gave his name as Gene Johnson. Burdette frisked McQurter for weapons and asked him if he would come up to the tavern and endeavor to get things straightened out. McQurter got in the back seat of the patrol car and they drove to the tavern. Burdette did not place handcuffs on McQurter.

When Burdette arrived at the tavern, Officer Duncan and Barber were there. Burdette learned that McQurter had given another name the night before. While Burdette was having a conversation with Barber and Duncan, McQurter remained in the rear seat of the patrol car. It was impossible for him to get out normally, for the handles had been taken off the doors and windows and there was a wire screen between the front and back seats. At some point while all were at the tavern, McQurter again became enraged and started cursing. He told Barber that he would get him for having him arrested. At about this point the officers told McQurter that he was under arrest for terroristic threats.

The officers apparently were still in some doubt as to McQurter's true name, so they drove to his nearby residence where they thought they might get a proper identification.

Burdette drove McQurter to his residence and Duncan followed. When they reached the home McQurter's father and sister-in-law came out and identified McQurter. At the time McQurter was loud but not violent. It seemed to the officers that McQurter was under the influence of alcohol and "something else." A later autopsy revealed that McQurter had ingested barbiturates and alcohol.

After the brief stop at the residence Burdette began backing his car up the street away from McQurter's home. McQurter protested about being taken to jail and started shaking the screen. Next, he started kicking at the back window of the car. Burdette brought his car to a stop and got out, and Duncan, who was nearby, did the same and came to Burdette's assistance. One of the rear side windows broke, and McQurter started coming out. The officers hit him on his shins with slapjacks, and Duncan hit him on the head several times with a four-cell metal flashlight he was carrying. While coming out of the car McQurter managed to kick the officers. Burdette and Duncan tried to pin him to the side of the car and handcuff him. A

cuff was successfully attached to one of his wrists, but the other was free, and McQurter began slinging it around at the officers. Duncan, using his flashlight, attempted to get a choke hold on McQurter and he succeeded after a fashion. Duncan had been taught to use the carotid hold.[1] However, Duncan instead applied pressure initially on the front part of the throat. Duncan and McQurter dropped to the ground and Duncan continued to apply pressure. McQurter was struggling. Burdette managed to attach the other cuff to McQurter's wrist. He then asked Duncan to roll over so he could get that officer's cuffs. Duncan obliged and Burdette then manacled McQurter's feet.

At the beginning of the scuffle one of the officers had placed a help call on his personal radio. After McQurter was cuffed the help call was cancelled, and instead, a call was given for supervisors and for a paddy wagon. From this point on, of course, there was no possibility of McQurter escaping, and the two officers were quite capable of otherwise controlling McQurter.

After McQurter was cuffed and manacled, Duncan adjusted his choke hold so as to apply pressure on the sides of the neck. In the first few moments McQurter continued to resist and at one point attempted to pull Duncan's flashlight away from him. He raised up several times and at one point was able to speak or mumble something to his father who had arrived on the scene. Each time McQurter sought to move, raise up, or resist, Duncan applied increased pressure with the choke hold. When McQurter was still, Duncan relaxed the pressure. For several minutes prior to the arrival of the paddy wagon which transported McQurter to the hospital, he was quite motionless, and when the officers placed him in the paddy wagon, he was completely limp and apparently unconscious.

A half-sister of McQurter saw the struggle and came running up the street to find her brother pinned down by the officer. She then went screaming back to the residence. Thereafter, eight family members and ten or twelve other bystanders arrived, as did Lt. N.D. Lauth and Sgt. E.W. Grier. The crowd was boisterous but not unruly. One of the officers told family members that if they did not get away from the scene they would be locked up. A neighbor was photographing the scene and an officer directed him to desist or he would be arrested. From the time McQurter was subdued until the paddy wagon arrived, fifteen minutes elapsed. During the first few minutes Burdette was involved in making calls on his radio, dealing with the family members who had gathered, and briefing Lt. Lauth. He did nothing to induce Duncan to release the choke hold or to get off McQurter. He did not at any time check on McQurter's physical condition, attempt to apply any first aid, or attempt to call any medical personnel to the scene.

Lt. Lauth arrived on the scene about five minutes after McQurter was subdued. He observed Officer Duncan on his knees with his chest across McQurter's back, and he saw a choke hold being applied. He was briefed by Burdette and he then asked Duncan if he wanted to get up off of him. Duncan said no and Lauth said nothing further in this respect. Lauth testified that at the time he arrived on the scene McQurter posed no danger of escape and that he felt that everything was under control. Lauth was the senior officer in charge when he arrived. He apparently devoted most of his attention to the crowd.

At some point a paddy wagon arrived, but Lt. Lauth sent it along when he learned that it already contained a violent prisoner. Lauth did nothing to learn of McQurter's condition, nor did he administer any sort of first aid on the scene, nor did he attempt to seek the assistance of any sort of medical personnel.

---

**1.** There are two kinds of choke holds. One involves placing the arm or a baton across the front of the throat so as to cut off the supply of oxygen to the lungs. The other involves applying pressure on the carotid arteries on either side of the neck so that the supply of blood and oxygen is cut off from the brain.

After Lauth arrived Sgt. Grier came to the scene. He saw a lot of broken glass on the street, a police car with its rear window out, a large noisy crowd, and saw that Officer Duncan was on the ground. He made no attempt to find out what was going on with Duncan and did not consciously think out what his responsibilities were. Instead, he merely started dealing with the crowd. When the second paddy wagon arrived, Grier helped place McQurter's limp body in it. Grier never attempted to give any first aid or order anyone else to do so. Neither did he attempt to obtain the presence of medical personnel at the scene.

The paddy wagon transported McQurter's body to Grady Memorial Hospital. It is most likely that he died en route. When the paddy wagon got to Grady, McQurter's body was removed and placed in a wheelchair and taken straightaway to the detention area of the hospital. After some time personnel noticed that there was something wrong with McQurter. He was checked and it was discovered that he had died.

The testimony of Dr. Joseph Burton, a medical examiner for Fulton County, Georgia, was most interesting and helpful. He performed the autopsy on McQurter's body. His secondary findings included bruises and abrasions on the hands, arms, feet, head and legs. He felt that the marks that he observed on the legs were consistent with the theory that McQurter had continued to struggle after the cuffs had been applied. He found bruises on the thyroid and around the bone in the Adam's apple. The hyoid bone in the throat was fractured. The trachea was reddened and the vocal cords were swollen. McQurter had a trace amount of alcohol in his blood and a heavy amount of secobarbital.

McQurter died as a result of asphyxia which caused cardiac arrest. The asphyxia resulted from a combination of the swelling in the throat and the aspiration of gastric juices into the lungs. The death was not instantaneous, and, as noted, McQurter in all likelihood died while in the paddy wagon. The asphyxiation to some extent was aided by the presence of secobarbital which has the tendency to depress the respiratory system, thereby reducing the depth of breath and the amount of air inhaled.

Asphyxia may be avoided during the earliest stages. Mouth-to-mouth resuscitation would not be a therapy of any utility after the patient had aspirated, but death might have been averted by the performance of an emergency tracheotomy on the scene. This sort of procedure is routinely performed by properly trained physicians' assistants in emergency situations.

After the incident Officers Burdette and Duncan were suspended pending an inquiry. The matter was turned over to the District Attorney of Fulton County, who presented an indictment to the grand jury. It was not billed. An internal investigation dealing with much the same evidence as is before the court did not find Burdette and Duncan guilty of any infraction of Department rules. They both were restored to duty and given back pay.

After the incident in question and after Duncan and Burdette were exonerated by the internal investigation, neither officer was retrained or counseled concerning any of his conduct during the event.

During the years immediately prior to the death of Bennie McQurter, Captain R.M. Lane and Major R.A. Davis were in charge of police training at the Atlanta Police Academy. Both men were qualified by education and experience for the positions which they held. The training provided generally, and specifically in the use of the choke hold, was appropriate and proportional to the time and resources allowed these men by the City of Atlanta and by the leadership of the Atlanta Bureau of Police Services.

The City of Atlanta had a number of formal and informal policies and procedures which are relevant to a determination of this case. Generally, when dealing with an injured subject, the officers were directed to do what they could to provide first aid and then to have the subject transported to Grady Hospital via paddy wagon. The officers were not to use Grady emergency vehicles to transport a violent prisoner unless

there was a grave danger of death or permanent injury. The general rule was that prisoners were not to be transported to the hospital in police cruisers. Prevailing standards of police work in this country today require that the officer on the scene render first aid to any injured subject and obtain the presence on the scene of any emergency professionals needed to assist in more aggravated cases. The officers in this case did not meet that standard, nor did they follow their own internal procedure which required the officer to check specifically on injuries to a subject before he is transported.

Since August 22, 1977, pursuant to an order by Deputy Director Eldrin Bell of the Atlanta Police Academy, the Atlanta Bureau of Police Services has not offered training in the choke hold, but its use has not been circumscribed by any directive or policy. During the years in which it was taught, instruction was given by a qualified teacher, and the recruits were directed to try it out on each other. The instructor would then observe and correct. In toto, the teaching usually lasted an hour. Recruits were taught that the hold could cause death or serious bodily injury, that it was not to be used in cases of passive resistance, that it would cut off the blood and oxygen supply to the brain, and that its use should be discontinued after a subject was cuffed or went limp. Further, recruits generally were taught that it should not be applied to the frontal area of the throat. Also, the teaching directed officers not to drop to the ground with a person to whom the hold was being applied, and officers were told to give first aid in the event that a choke hold victim became unconscious.

Prior to 1973, the defendants did not maintain records regarding the incidence of injury or death resulting from use of the choke hold. On November 29, 1973 Virgil Williams, Jr., was killed by application of the choke hold by ABPS officers.

Recruits are given basic first aid training, and there is a first aid kit in each police cruiser.

The court finds that the evidence of the training received by the four officers who were on the scene and their responsiveness to the policies and procedures of the Atlanta Bureau of Police Services shows the following. Lt. Lauth is a high school graduate who has been with the force since 1965. He had no recruit training in defensive tactics, and, prior to this incident, he had provided none to his subordinates. He had, however, received some training in the use of the choke hold while in the military. He did not believe that he had any responsibility for training the officers under his command, for he assumed that they had all gone through the recruit school. He has given no instructions himself on the use of deadly force and recalled only three other instances when deadly force had been used under his command. He testified that while on the scene he saw no violation of any Bureau policies, rules or orders, and at no time since the event has he disciplined anyone because of the incident. It should be noted that the slapjack and the four-cell flashlight used by the officers in the incident were not equipment which an Atlanta Police Officer was authorized to carry.

Sgt. E.W. Grier was hired by the police department in 1968. He has two years of college education and served a stint in the military. He was the immediate supervisor of Burdette and Duncan and served under Lt. Lauth. Sgt. Grier received his promotion to the position of detective by a competitive examination but was promoted to sergeant without even filing an application. He was not tested for competency prior to his promotion. He received courses in defensive tactics in recruit training and subsequently at the FBI Academy. However, he was never instructed in the choke hold and has never used it. Grier stated that among his duties were the obligations to observe, evaluate and control arrest techniques of his subordinates. He did not consider it his responsibility to maintain proficiency in defensive tactics, and he stated that very little training was done in the field. He, himself, does not use any special tactics. He said that he just uses common knowledge that the best man wins and generally does what

is necessary to make the arrest, including clawing, fighting, grabbing, and holding. Grier stated that he had had no occasion to discuss defensive tactics with any of his subordinates. He was trained in first aid and understood that it was supposed to be administered when necessary. In his years on the force, however, he had not had any occasion to do so. He said that he felt that the treatment which McQurter received on the scene was consistent with Department policy. He also testified that there was no point in maintaining a choke hold on a subject after he was cuffed and manacled.

Subsequent to the event Grier had occasion to rate both Officers Duncan and Burdette. As he had found nothing wrong with their conduct at the scene, he did not comment on the event in the rating. Further, he said that he did not mention it because there was no space for such comment on the form. Duncan's performance rating actually improved after the incident.

Officer Burdette was hired in 1973. He went through a twelve-week training course which consumed 40 hours per week. Of the twelve weeks, two weeks were spent in the field riding with experienced officers and observing. He was trained at the Police Academy in defensive tactics and received a unit on the application of the choke hold and was taught something about the situations in which it might be employed. He was informed that it would cut off the blood supply to the brain and that its application could result in death or serious injury. The instructions included admonitions that the deadly force limitations applied to the use of the choke hold. After the lecture portion of the unit on the choke hold, the instructors demonstrated the hold, and then each of the recruits tried it on another. Burdette was not tested after he left recruit school and there was no effort in the next four years to see if he retained any proficiency in the use of the hold.

Officer Duncan also was hired in 1973. He went through a different recruit class, however. There were 75 to 100 people in the class. He received 240 hours of training, including one week on the firing range. He had no field training. He received the same training on the choke hold as Officer Burdette. He specifically recalled being told that each subject is different and that the hold should always be released if the person goes limp. He was told that if it were continued too long, it could cause death and that it was to be used only to control a violent person when a situation was just short of that which would authorize the use of a firearm. He received training in other defensive tactics and received basic first aid training. Officer Duncan, like all other ABPS recruits, was instructed in the carotid hold. Duncan had applied the choke hold on three or four occasions prior to the McQurter incident with no ill effect to his subject.

It is the policy of the Atlanta Bureau of Police Services Training Department to make available post-recruit class courses and to encourage attendance at courses put on by others. Lt. Lauth attended a course at the University of Georgia in supervision and also in police management. He also received training in performance evaluation, in crisis intervention, and, at Ft. Benning, in managing civil disturbances. Sgt. Grier attended a similar course at the University of Georgia on police supervision. At the Georgia Institute of Technology he had a unit on human relations, and he attended the FBI National Academy for three months. Grier has returned to the Academy once for retraining. Also, he has had courses in hostage negotiation and crisis intervention and has had the instructor's course at the Georgia Police Academy. Officers Burdette and Duncan have had courses in crisis intervention and additional courses in the use of firearms since they left recruit school.

Defendant City is a municipal corporation which maintains and operates the ABPS, including the Atlanta Police Academy, and has done so at all relevant times herein. The City employed each of the defendants herein on July 18, 1977. Defendant Eaves was the duly appointed Commissioner of Public Safety, and Lauth and Grier were supervisory officers who had defendants

Duncan and Burdette under their command on that date. All conduct by individual defendants in this action occurred when they were employees of the City and were acting under color of law as members of the ABPS.

In concluding these findings dealing with police training and tactics, the court would add one additional finding. The plaintiff called a witness named DiGrazia as an expert on police standards and procedures. The court, of course, understands that an expert is called because his testimony is helpful to the side calling him. However, the court judged by Mr. DiGrazia's answers and by his manner in testifying that he was more an advocate for abolition of the choke hold than an academician giving evidence and conclusions arrived at objectively. Frequently he did not articulate reasons for his opinions, and at least one of the options for the control of McQurter which he proposed was shown by the defendant to be anything but viable. For these reasons the court does not give his testimony any appreciable weight.

The following findings relate to matters touching on the question of damages.

At the time of his death Bennie McQurter was 25. According to the mortality table submitted in evidence by the plaintiff, he had an anticipated life expectancy of an additional 45.82 years. He had completed ten years of schooling and was an A to B student. He dropped out of school in the tenth grade to go to work, beginning his employment career with A & P as a stock clerk and cashier. He enlisted in the military, received special training in radio relay and received an honorable discharge in 1973, having obtained the rank of E–4. Thereafter, McQurter worked in appliance repair for General Electric, in apartment maintenance, and in appliance delivery. His last job before his death was in shipping and receiving at Sealtest, where he received a wage of $215 per week after taxes. He was laid off from that job in November of 1976. At the time of his death he was not steadily employed.

McQurter was married in 1970 to the plaintiff in this case, Patricia McQurter. In 1973 they had a son, Christopher McQurter. Additionally, he was a step-father to Mrs. McQurter's two children. The evidence indicated that he was very fond of his son, hunting and fishing with him and spending a great deal of personal time with him. He worked around the house and made repairs to the house and car.

Mr. and Mrs. McQurter were separated in May of 1977. They had separate apartments but saw each other regularly and were attempting to reconcile their differences.

McQurter was an epileptic but his seizures were controlled to a large degree by medication. He drank occasionally. His final funeral expenses were $1,426.92.

## CONCLUSIONS OF LAW

Under 42 U.S.C. § 1983 the plaintiff must establish two elements: conduct by the defendants under color of state law; and a resulting deprivation of rights, privileges and immunities secured by the federal constitution and laws. *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1912, 68 L.Ed.2d 420 (1981). The parties have stipulated to the first element, that all conduct by the individual defendants occurred when defendants were employees of the defendant City and were acting under color of law. The plaintiff alleges that the defendants deprived the decedent, Bennie McQurter, of several rights guaranteed by the United States Constitution. They are stated as "his rights, privileges and immunities guaranteed him under the Fourth, Eighth and Fourteenth Amendments to the Constitution of the United States and Title 42, U.S.C. §§ 1983 and 1985(3) . . . to be free from unlawful arrest, physical abuse, cruel and unusual punishment and deprivation of his life and liberty without due process and equal protection of the law."

### I. Fourth Amendment Claim and State Claim for Unlawful Arrest.

The plaintiff asserts that McQurter's right to remain free from unlawful searches

and seizures under the Fourth Amendment was violated and that McQurter was unlawfully arrested under the provisions of Georgia law. In support of her Fourth Amendment claim, plaintiff argues that the facts show that under the analysis of *United States v. Berry,* 670 F.2d 583 (former 5th Cir.1982) (en banc), McQurter was seized when Burdette stopped him on the street; that seizure became an arrest when McQurter accompanied Burdette back to the tavern; Burdette's search of McQurter on the street was illegal under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); and his arrest was illegal since no warrant existed, there were no exigent circumstances, and no probable cause existed.

■ *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) established that the police may lawfully make a stop and conduct a search minimally necessary to determine whether the individual stopped is armed on a showing of "reasonable suspicion." The rationale of *Terry* was extended by *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) to seizure and frisking of an individual on the basis of reasonable suspicion based on an informant's tip. The *Terry* standard is an exception to the requirement of probable cause for Fourth Amendment seizures of persons. When a seizure exceeds the limited intrusion of an investigative stop, it must be justified by the probable cause standard or be based on consent. *See Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (citing *United States v. Brignoni-Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975).) Such a seizure occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1979).

■ Under the facts of this case, a seizure amounting to an arrest occurred before Burdette took McQurter back to the tavern. McQurter was stopped, frisked and questioned about whether he was the person who was involved in the tavern incident by a uniformed police officer. Responding to the officer's request that he come up to the tavern and straighten out the matter, McQurter got in the back seat of a patrol car which he could not leave. From these circumstances, even though Burdette did not at that time tell McQurter that he was under arrest, a reasonable person would not have believed he was free to leave. *See Mendenhall* at 554, 100 S.Ct. at 1877. *Cf. Dunaway,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (suspect was seized in the Fourth Amendment sense when he was taken into custody involuntarily and taken to the police station for interrogation).

■ The defendants argue that McQurter voluntarily consented to return to the tavern with Burdette. This question must be determined by the totality of the circumstances, which must show that his consent was in fact voluntary rather than "the product of duress or coercion, express or implied." *Mendenhall* 446 U.S. at 557, 100 S.Ct. at 1879, citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). The defendants have the burden of proving voluntary consent, *Schneckloth* at 222, 93 S.Ct. at 2045 and the defendants here have not met this burden. After stopping, questioning and frisking McQurter, Burdette testified, he asked McQurter "if he would go back up there voluntarily to clear up the matter. He voluntarily went." Aside from the inherently self-serving nature of this testimony and its consequent lack of trustworthiness, the implicitly coercive nature of a uniformed police officer's request that a suspect accompany him under the circumstances may exert pressure on the individual to acquiesce. Such acquiescence cannot, of course, substitute for free consent. *Bumper v. North Carolina,* 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1791–92, 20 L.Ed.2d 797 (1968).

■ Having concluded that McQurter was seized and that he did not consent to the seizure, and no warrant having been obtained for his arrest, it must be deter-

mined whether Burdette's seizure amounting to an arrest was justified by probable cause. The standard for finding probable cause is well established: probable cause exists if facts and circumstances within the knowledge of the arresting officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that an individual has committed a crime. *See, e.g., Draper v. United States,* 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1959); *United States v. Long,* 674 F.2d 848 (11th Cir.1982).

Burdette had been told by Barber, a reliable source as a business owner and complainant who directly witnessed the incidents, *see Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), that McQurter had threatened to kill him and that he had created a disturbance the previous evening and a week earlier. Barber described McQurter to Burdette. Officer Duncan, who had ordered McQurter off of Barber's premises the previous evening, told Burdette of the prior incident and also gave him a physical description of McQurter, thus corroborating the information given by Barber. Burdette saw a man answering the description. It was reasonable under these circumstances and knowing these facts for Burdette to believe that McQurter was the man who had threatened to kill Barber. Thus, Burdette had probable cause to arrest McQurter for violating O.C.G.A. § 16–11–37, which provides that "[a] person commits the offense of a terroristic threat when he threatens to commit any crime of violence . . . with the purpose of terrorizing another . . . or in reckless disregard of the risk of causing such terror." McQurter's seizure, search and arrest were therefore lawful and gave rise to no claim for violation of his constitutional rights.

▆ Plaintiff also asserts that the warrantless arrest of McQurter violated Georgia law, which provides that a warrantless arrest may only be made (1) if the offense was committed within the law enforcement officer's presence or within his immediate knowledge; (2) if the offender is endeavor-

ing to escape; (3) if the officer has probable cause to believe that an act of family violence has been committed; or (4) for other cause if there is likely to be a failure of justice for want of a judicial officer to issue a warrant. *See* O.C.G.A. § 17–4–20(a). Plaintiff argues that none of these exceptions was satisfied, including the fourth, which has been interpreted to incorporate probable cause, *see Pistor v. State,* 219 Ga. 161, 132 S.E.2d 183 (1963), since there was no probable cause for McQurter's arrest.

▆ Under Georgia judicial decisions, an officer may arrest on probable cause. *See McCorquodale v. State,* 233 Ga. 369, 211 S.E.2d 577 (1974); *Arnsdorff v. State,* 152 Ga.App. 515, 263 S.E.2d 176 (1979); *Chaney v. State,* 133 Ga.App. 913, 213 S.E.2d 68 (1975); *Quinn v. State,* 132 Ga.App. 395, 208 S.E.2d 263 (1974); *see also Nicholson v. United States,* 355 F.2d 80 (5th Cir.1966); *Diamond v. Marland,* 395 F.Supp. 432 (S.D. Ga.1975). This court having found that Burdette had probable cause to arrest McQurter, under Georgia law he had the authority to arrest McQurter. Thus, McQurter's arrest was not unlawful and did not give rise to a state tort action.

Because the court has found that McQurter's arrest and the search of his person related to the arrest were lawful under both the United States Constitution and Georgia law, the court will not consider plaintiff's argument that McQurter had the right under federal and state law to resist illegal arrest.

*II. Fourth and Fourteenth Amendment Claim for Excessive Use of Force.*

Plaintiff asserts that McQurter's right to remain free from arbitrary infliction of injuries and his right to life were violated under the Fourteenth Amendment guarantee against deprivation of life and liberty without due process and under the Fourth Amendment's guarantee of the right to be secure in one's person. She argues that the amount of force used in relation to the need presented, the extent of the injury inflicted, and the evidence of Officers Duncan and Burdette's maliciousness rises to the level of a constitutional injury cognizable under sec-

tion 1983. The defendants argue that the facts show that Duncan and Burdette utilized reasonable force under all the circumstances.

The use of excessive force by law enforcement officers may give rise to section 1983 liability. *See, e.g. Palmer v. Hall,* 380 F.Supp. 120 (M.D.Ga.1970), *aff'd,* 517 F.2d 705 (5th Cir.1975). In addition, the right to life is undisputedly of constitutional dimension. U.S. Const. amendment XIV, § 1; *see, Dollar v. Haralson County, Georgia,* 704 F.2d 1540, 1543 (11th Cir.1983); *Williams v. Kelley,* 624 F.2d 695, 697 (5th Cir.1980). However, because section 1983 is not a general tort statute, the plaintiff must show that the injury inflicted arose to the level of a constitutional tort, being sufficiently egregious to exceed the boundaries of wrongful injuries redressable under tort law and depriving the victim of a Fourteenth Amendment "liberty" interest without due process of law. *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Shillingford v. Holmes,* 634 F.2d 263 (5th Cir.1981).

Whether or not the force used and the physical injury inflicted amount to a constitutional deprivation must be determined on a case by case basis. *Shillingford* at 265. The court must consider "the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Williams v. Kelley,* 624 F.2d at 697 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2nd Cir.1973)); *see Shillingford,* 634 F.2d at 265–66.

Under the facts presented here, the court concludes as a matter of law that the force used in effectuating McQurter's arrest, causing severe injuries leading to death, was excessive. At the tavern when the officers told McQurter that he was under arrest, he had been shouting and cursing. When the officers reached McQurter's residence he continued to be loud but not violent and was apparently intoxicated. The officers knew that McQurter was unarmed. When Burdette began to leave the residence, McQurter began shaking the screen and broke a rear side window. Although his behavior provoked the confrontation and he continued to struggle, the force used after he was subdued was both excessive and malicious.

Duncan's initial application of the choke hold arguably was to bring McQurter under control so that he could be cuffed by Burdette. Once McQurter's hands and feet were manacled, however, he was effectively restrained, and continued use of the choke hold was excessive and malicious. McQurter's efforts to raise himself or to pull the flashlight away from his throat while he was cuffed hand and foot did not give rise to a need to continue the use of deadly force. Neither Duncan nor Burdette could have reasonably believed at that point that the use of deadly force was necessary to prevent death or serious bodily injury to themselves or a third party, and Duncan's continued application of the choke hold was not in a good faith effort to maintain control by the two officers, since it was highly unlikely that McQurter could escape. *Cf. Williams v. Kelley,* 624 F.2d 695 (application of choke hold to prisoner, which apparently caused his death, was not constitutionally tortious where choke hold was used by jailors to protect their own safety and in a good faith effort to maintain or restore discipline).

Defendants Duncan and Burdette have asserted in their post-trial brief the defense of qualified good faith immunity, citing *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), arguing that their use of force was "absolutely reasonable."

The defense of qualified or "good faith" immunity is available to law enforcement officers to protect them from liability for damages if they acted in the good faith belief based upon reasonable grounds that the measures they took were necessary. *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978); *Barker*

*v. Norman,* 651 F.2d 1107 (5th Cir.1981). The defendants have the burden of raising this defense. *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The court finds that the defendants plead the substance of this defense in their answer.[2] After the defendants raise the defense, the plaintiff has the burden of showing that the defendants were not acting in good faith. *Barker* at 1121.

Under the Supreme Court's decision in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the subjective component of the good faith test was eliminated, leaving the objective test for good faith, which shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known (cite omitted)." *Harlow* 102 S.Ct. at 2738. A violation of clearly established state law or regulations would deprive defendants of the qualified immunity defense. *See Butz,* 438 U.S. at 504, 98 S.Ct. at 2909; *Williams v. Treen,* 671 F.2d 892, 900 (5th Cir.1982); *Chavis v. Rowe,* 643 F.2d 1281, 1289 (7th Cir.1981); *Williams v. Board of Regents,* 629 F.2d 993, 1000 n. 11 (5th Cir. 1980).

The court has already found, based on the evidence and on its observation of the officers as they testified, that Duncan could not have reasonably believed that deadly force was necessary to prevent death or serious bodily injury to himself, to Burdette, or to a third party once McQurter was cuffed hand and foot. The continued application of the chokehold thus violated clearly established constitutional, statutory, and regulatory standards of which Duncan cannot have been unaware.

**III. Failure to Intervene by Lauth, Grier and Burdette.**

The plaintiff asserts that defendants Lauth, Grier and Burdette should be held directly liable for their failure to prevent or to intervene in Duncan's continued application of the chokehold to Mr. McQurter in violation of his rights. The defendants argue that they are not liable for their failure to order Duncan to "get off Mr. McQurter" since they did not exhibit deliberate indifference to the alleged deprivation of constitutional rights in that they considered that McQurter still posed a danger to himself and others even though he might not have been capable of escape and in that the primary concern of the supervisory officers was maintaining control of the crowd.

 Supervisory officials may not be held liable under Section 1983 under the doctrine of *respondeat superior. Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Baskin v. Parker,* 602 F.2d 1205 (5th Cir.1979). The plaintiff must show either that the official was personally involved in the unlawful actions or that there is some causal connection between an act of the official and the alleged violation. *See Baskin* at 1208–09; *Henzel v. Gerstein,* 608 F.2d 654 (5th Cir. 1979).

It has been held that failure or refusal to intervene by a supervisory official when a constitutional violation such as a beating is taking place in his presence establishes direct liability under Section 1983. *Byrd v. Brishke,* 466 F.2d 6 (7th Cir.1972), cited with approval in *Harris v. Chanclor,* 537 F.2d 203, 206 (5th Cir.1976). Presence and acquiescence in the unlawful act establishes the requisite "personal involvement" of *Baskin.* In *Harris* the plaintiff was viciously beaten in the defendant jailer's presence,

**2.** The defendants plead in their Second Defense that their actions "were reasonable, proper and necessary under the circumstances" and in their Third Defense that their actions "were taken in the good faith exercise of their duties and responsibilities as imposed upon them by law." *See Gomez,* 446 U.S. at 640, 100 S.Ct. at 1924 ("it is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful."). But c.f. *Jones v. Evans,* 544 F.Supp. 769, 773 n. 2 (N.D.Ga. 1982) (because defendants plead that they acted reasonably and in good faith but did not affirmatively plead qualified immunity as a defense and did not move to amend their answer to add the defense, it could not be asserted at the summary judgment stage).

in violation of his Eighth Amendment rights, without objection or intervention. Similarly, in *Davidson v. Dixon,* 386 F.Supp. 482 (D.Del.1974), the District Court of Delaware held that a superior officer who was present at an inmate's beating, had knowledge of it, and acquiesced in it, was a direct participant in the attack, his actions (or inaction) being sufficient to render him liable, since the effect of his presence, office and failure to intervene was to sanction and encourage the unlawful activity. *See also Bruette v. Knope,* 554 F.Supp. 301 (E.D. Wis.1983). The court in *Byrd* found this liability for nonfeasance in the failure of the officer to act according to duty imposed by his office to enforce the law. *See also, Bruett; Smith v. Heath,* 691 F.2d 220 (6th Cir.1982); *Putman v. Gerloff,* 639 F.2d 415 (8th Cir.1981); *Schnell v. City of Chicago,* 407 F.2d 1084 (7th Cir.1969).

■ The evidence shows that when Lauth and Grier arrived at the scene, Duncan was over the cuffed and manacled McQurter and was applying the chokehold, a technique classified as "deadly force," in the same category as "use of a firearm." Neither Lauth, the senior officer, nor Grier, both of whom were superior officers to Duncan and Burdette, intervened in Duncan's continued and unnecessary use of the chokehold. Their argument that he still posed a danger to himself and others is flawed, since courtroom demonstration during the trial showed that two officers could easily have controlled a shackled prisoner without the use of life threatening force. Their assertion that their primary concern was maintaining control of the crowd is also unavailing. First, although it is appropriate for the police to be concerned about crowd control whenever a group gathers at the scene of an arrest, the concern for the constitutional rights of a prisoner is paramount. Second, the crowd which gathered was not hostile and riotous but merely boisterous. Four officers were present, and the 30 seconds or less that it would have taken to order Duncan to release the chokehold would not have detracted from the officers' ability to control the neighbors and family members who had gathered.

If the deadly force being used had been a firearm rather than a chokehold, with the officer continuing to fire once the arrestee was shackled and when other, less stringent means of control were available, the situation would be no worse. Lauth and Grier as Duncan's supervisory officers had a duty to intervene in the excessive use of force against McQurter and failed to do so. Therefore, they are directly liable for Duncan's excessive use of force against McQurter in violation of his rights under the Fourth and Fourteenth Amendments.

■ As to the issue of Officer Burdette's direct liability for his failure to intervene, the court finds that he is also liable. The Court of Appeals for the Seventh Circuit in *Byrd,* 466 F.2d 6, held that the same duty to intervene obtains as to non-supervisory officers who are present as to supervisory officers, "for to hold otherwise would be to insulate non-supervisory officers from liability for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace." *Id.,* at 11; *Cf. Putman,* 639 F.2d 415 (subordinate could be held jointly liable for failing to intervene if fellow officer, albeit his superior, was using excessive force). The situation here was not one where the supervisory officers ordered the conduct or ordered it continued. *Cf. Vela v. White,* 703 F.2d 147 (5th Cir.1983) (police officer who arrested plaintiff on supervisory officer's order to arrest when there was no probable cause for arrest was immune from liability for unlawful arrest). Nor was Burdette ordered to execute some order inconsistent with intervention, such as interviewing witnesses. As with Lauth and Grier, Burdette's responsibility with crowd control did not diminish his responsibility to intervene in Duncan's application of excessive force to McQurter. Thus, he is jointly liable for failing to intervene.

*IV. Liability of Lauth, Grier, Burdette and Duncan for Failure to Provide Medical Attention.*

The plaintiff argues that the police officers present at the scene should be held

liable for their failure to provide medical attention to McQurter in that it was their constitutional duty as well as their duty under written directives of the ABPS to provide assistance to injured prisoners. Plaintiff argues that defendants' failure to follow established Bureau directives, their knowledge that plaintiff was injured, their failure to determine the extent of his injuries or his condition, their failure to summon medical aid to the scene, provide any first aid themselves or transport McQurter to the hospital in a patrol car, and their wheeling of the unconscious McQurter to the detention area upon arrival at Grady rather than to the emergency room amounted to deliberate indifference violating his constitutional right to be free from cruel and unusual punishment.

The four officers argue that the evidence shows that they acted reasonably under the facts and circumstances and that egregiousness should not be implied because of the "sad conclusion" of the episode. Their conduct, they argue, did not amount to the deliberate indifference to McQurter's condition necessary to violate his constitutional rights since their "conduct during the tumultuous few minutes on Oakland was a spontaneous reaction to a wildly violent and strong McQurter with a threatening crowd." They point out particularly that they noticed McQurter's cuts but did not consider them life threatening; that Burdette called for a paddy wagon rather than an ambulance because McQurter was violent; that no attempts to administer first aid were made since McQurter "continued to talk about getting loose"; that they did not notice that McQurter was unconscious until they placed him in the paddy wagon; that they were faced with a volatile crowd; that they took McQurter to the detention area though he was unconscious because they "were concerned about McQurter's recently demonstrated violence and were aware of his intoxication on drugs, ... and knew of no injuries beyond the superficial cuts"; and that they were in detention only a few minutes before realizing that McQurter "was in serious trouble," where-

upon they "took him directly to the emergency room."

Initially, the court notes that plaintiff relied upon the Eighth Amendment prohibition against cruel and unusual punishment in her complaint. Under the Supreme Court's holding in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), this court will rely on the due process clause of the Fourteenth Amendment, also pled by the plaintiff. Mr. McQurter was not a sentenced inmate who could be punished, albeit not cruelly or unusually, under the Eighth Amendment, but was a pretrial detainee. Due process requires that a pretrial detainee not be punished; therefore, where punishment is imposed without adjudication, the pertinent constitutional guarantee is the due process clause. *Bell* at 535, n. 16, 99 S.Ct. at 1872, n. 16.

However, it appears that the courts have continued to apply the analysis under the Eighth Amendment to actions by pretrial detainees in § 1983 actions. *E.g., Dean v. Gladney,* 621 F.2d 1331 (5th Cir.1980); *Walker v. Fayette County,* 599 F.2d 573 (3d Cir.1979); *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1079–80 (3d Cir. 1976). Therefore, this court will employ the standard established by *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), to analyze whether the officers' conduct in this case in failing to give McQurter medical attention amounts to a constitutional tort. *Estelle* rejected a negligence standard and requires a showing of "deliberate indifference to serious medical needs." *Estelle* at 106, 97 S.Ct. at 292.

*Estelle* requires a showing of callous or conscious indifference to prisoners' rights by each person charged. *See Williams v. Bennett,* 689 F.2d 1370, 1380 (11th Cir. 1982); *Burr v. Duckworth,* 547 F.Supp. 192, 196 (N.D.Ind.1982); *see also Jerry v. Francisco,* 632 F.2d 252, 256 (3d Cir.1980) (Adams, J., concurring); *Id.* at 256 n. 5 (majority agrees with J. Adams).

All four officers were present at the scene, and the court's findings regarding the failure to give medical attention apply to all. The court notes that although the

officers do not directly argue that their good faith immunity shields them from liability on this ground, it is clear that the officers violated McQurter's established constitutional right to be free from punishment. *See Harlow,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396.

 The court finds that under the facts and circumstances of this case, the four officers exhibited deliberate indifference to the serious medical needs of the dying Benny McQurter. There is no question but that his needs were serious, resulting in the ultimate injury. Duncan and Burdette had some training in the chokehold, a defensive tactic capable of causing death or serious bodily injury. By its nature the chokehold cuts off the supply of blood and oxygen to the brain, and all the officers knew or stated at trial that the chokehold should be discontinued once the subject was cuffed or went limp. All of the officers had basic first aid training. Prevailing standards of police work require that the officer on the scene render first aid to any injured subject and obtain emergency professionals to assist in more aggravated cases. The four officers failed to meet this standard.

The attitude of total indifference to the medical needs of the prisoner is nowhere better illustrated than by the inattention once he reached the hospital. Although McQurter was still "unconscious" when the wagon reached Grady Hospital, he was taken to the detention area rather than the emergency room, where Duncan and Burdette began to file their report, knowing that McQurter had been subjected to life threatening force and had been unconscious since before he was transported to the hospital. The evidence also shows that McQurter had not been moving or speaking for some time before he was placed in the wagon, and Grier testified that he was limp when he was placed in the wagon. Thus has the plaintiff shown by a preponderance of the evidence that the officers knew that McQurter's condition required medical attention. All of the officers were indifferent to McQurter's condition, and none of them summoned emergency medical personnel. Since the evidence showed that McQurter most likely died on the way to the hospital, the failure to, at the least, check his condition and administer basic first aid was fatal. The evidence showed as well that emergency medical techniques could have been life saving. Nothing McQurter did after he was restrained or unconscious prevented the officers from checking his condition or excuses their failure to provide care.

Taken as a whole, the facts and circumstances show that these police officers were deliberately indifferent to McQurter's serious medical needs. The evidence shows that prompt action might have saved McQurter's life.

Therefore, the officers' conduct was unconstitutional and that conduct deprived McQurter of his constitutionally protected right to be free from punishment and his right to life under the Fourteenth Amendment due process clause.

*V. Liability of the City of Atlanta and of Reginald Eaves, Commissioner of Public Safety.*

The plaintiff asserts two theories for liability of the City and Commissioner Eaves. First, she argues that they are liable for failure to adequately train and supervise police officers, particularly in that no post-recruit training or instruction in the chokehold was provided,[3] and in that neither Lauth nor Grier received any training from ABPS in the chokehold. Second, the plaintiff argues that the City and Eaves are liable for a "coverup" of this incident, manifested by their failure to discipline any of the officers involved in McQurter's death for their actions or omissions. The failure to charge Lauth and Grier or to reprimand or discipline any of the officers, plaintiff argues, is evidence of the pre-existing poli-

---

**3.** The court held at trial that the *recruit* training provided was adequate under § 1983 and directed a verdict against the plaintiff for defend-

ants Lane and Davis, who were sued individually and in their capacities as training director or supervisors for the Atlanta Police Academy.

cy tacitly condoning constitutional violations such as those in this case.

The City and Eaves argue that they cannot be held liable for failure to train or supervise in that any lack of training or supervision was not reckless, in that neither training nor supervision was non-existent, and in that the need to inform or instruct police officers was not disregarded. Nor, they argue, was any lack of training or supervision grossly negligent under the prevailing standard for finding liability under such a theory. They argue that they are not liable for a coverup in that the facts are inconsistent with such a finding. Further, assuming that the facts would support a finding of coverup, the defendants argue that no cause of action is available under the Civil Rights Act for attempting to cover up such an incident.

Both the City and Eaves can be sued directly under § 1983 under the Supreme Court's holding in *Monell,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611. In that case the Supreme Court held that a municipality may be held liable when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." The Court in *Monell* noted that under § 1983 a causal link must be established between the execution of official policy and the constitutional deprivation for the municipality to be held liable. *Monell* at 691–92, 98 S.Ct. at 2036; *see Rheuark v. Shaw,* 628 F.2d 297 (5th Cir.1980). The causal link may be established in an action against a city official by a showing of the supervisory official's direct responsibility for the actions of the officers who engaged in the misconduct. *See Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *see also Rheuark,* at 305–06 (actions of members of commissioner's court were not a cause in fact of the great delay experienced by § 1983 plaintiffs in obtaining their statements of facts for appeal of their criminal convictions); *Henzel v. Gerstein,* 608 F.2d 654, 658 (5th Cir.1979). The official "need not have personally participated

in the constitutional deprivation for causation to be established, but may be held liable if he "breaches a duty imposed by state or local law, and this breach causes the plaintiff's constitutional injury." *See generally, Roberts v. Williams,* 456 F.2d 819 (5th Cir.), *cert. denied,* 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971) (cited in *Sims v. Adams,* 537 F.2d 829 (5th Cir.1976).) A supervisor may also be held liable for acts of subordinates if he fails to perform proper training and supervisory duties, *see Beverly v. Morris,* 470 F.2d 1356 (5th Cir.1972), or if he persistently fails to discipline subordinates in the face of knowledge of their propensity for improper use of force, *Sims,* at 832; *cf. Popow v. City of Margate,* 476 F.Supp. 1237, 1247 (D.N.J.1979), or in the face of knowledge of other improper conduct. *See Webster v. City of Houston,* 689 F.2d 1220 (5th Cir.1982).

Addressing first the issue of a coverup, it is clear that the civil rights of a person cannot be violated once that person is dead; therefore, coverup actions taken after the death of a person are not actionable. *Silkwood v. Kerr-McGee Corp.,* 637 F.2d 743 (10th Cir.1980); *Guyton v. Phillips,* 606 F.2d 248 (9th Cir.1979); *Whitehurst v. Wright,* 592 F.2d 834 (5th Cir.1979). Consequently, neither the City nor Eaves can be held liable for violating Benny McQurter's constitutional rights by any coverup which took place after his death.

From the City's investigation of the incident and the failure to discipline the four officers for their denial of McQurter's constitutional rights through their use of excessive force, their failure to intervene to protect McQurter against mistreatment, and their failure to provide medical assistance, the plaintiff infers that pre-existing city policy encouraged such unconstitutional actions. The plaintiff compares this situation to that set forth in *Webster v. City of Houston,* 689 F.2d 1220 (5th Cir.1982). There, the court found that evidence of a coverup in an investigation of a victim's death where a "throw down" weapon was used provided secondary support for the jury's verdict that a policy or custom exist-

ed in the Houston Police Department encouraging the illegal use of excessive force through toleration of the widespread use of throw downs in the face of widespread knowledge as to their use. The "studied coverup, this deliberate unwillingness to find the truth itself gave credence to the idea that a throw down was a tactic acceptable to the police hierarchy." *Webster,* at 1227.

■ In *Webster* the court had evidence of the police department's tacit condonation of the use of throwdowns coupled with the covering up in one instance of the use of a throw down, and, in light of those facts, found that the department and the city implicated themselves in the constitutional violation, thereby establishing the causal link between the action and the constitutional deprivation required by § 1983 and expounded on in *Monell* and *Rizzo.* In this case, on the other hand, the plaintiff has presented evidence of a failure to discipline in this case only and asks that the court draw the inference that the ABPS had a policy of using excessive force and failing to give medical attention. Without evidence that these practices were widespread, as in *Webster,* or that the municipality persistently failed to discipline officers for such known unconstitutional conduct, as in *Turpin v. Mailet,* 619 F.2d 196 (2d Cir.1980), such a policy cannot be inferred from the municipality's isolated decision not to discipline the officers involved in this incident. *See McLaughlin v. City of LaGrange,* 662 F.2d 1385 (11th Cir.1981) (isolated incident of failure to discipline subordinate did not establish custom by the city or culpable nonfeasance sufficient to constitute "malicious intent" on the part of the police chief); *Berry v. McLemore,* 670 F.2d 30 (5th Cir.1982) (policy of authorizing or encouraging police misconduct could not be inferred from a municipality's isolated decision not to discipline a single officer for a single incident of illegality); *see also Turpin,* 619 F.2d at 201–02.

■ Next addressing the issue of training and supervision as it relates to failure to have post-recruit training or instruction

in the chokehold, it is clear that simple negligence is insufficient as a basis for supervisory or municipal liability for failure to train. *See Reeves, infra.* The court having found at trial that the recruit training of Duncan and Burdette in use of the chokehold was sufficient, plaintiff bases her assertion of inadequate training on the post-recruit training, of which there was none in the chokehold, although the evidence showed that post-recruit instruction was given in the use of firearms, another method of deadly force.

In *Reeves v. City of Jackson,* 608 F.2d 644 (5th Cir.1979), the court of appeals discussed in *dicta* theories which would make out a § 1983 claim against a municipality under the Supreme Court's holding in *Monell.* Included was a standard for finding a municipality liable for training, supervising or disciplining of police officers—that the City was "reckless or grossly negligent." *See also Whitehurst v. Wright,* 592 F.2d 834 (5th Cir.1979); *Sirmans v. City of South Miami,* 86 F.R.D. 492 (S.D.Fla.1980). Although this standard has not been adopted by the Eleventh Circuit by direct ruling, the New Fifth has used this standard in cases presenting issues regarding training, supervising, or hiring. *See Vela v. White,* 703 F.2d 147 (5th Cir.1983); *see also Berry v. McLemore,* 670 F.2d 30 (5th Cir.1982); *Bowen v. Watkins,* 669 F.2d 979, 988 (5th Cir.1982). The court considers these authorities persuasive.

■ The failure of Eaves, who as Public Service Commissioner was responsible for the hiring and training of police officers, to provide post-recruit training to Duncan and Burdette in the chokehold, when viewed in light of their training as a whole, does not arise to recklessness or gross negligence. However, this finding is due only to the stringency of the standard for finding of supervisory liability for inadequate training. Extensive post-recruit training is provided in the use of firearms, but not in the use of the chokehold, which also constitutes deadly force. But this failure to refresh training in deadly force, though it may be simple negligence under the classic tort law

definition, does not arise to the level of recklessness which would subject Eaves and the City to liability.

■ On the other hand, the evidence shows that the City and Eaves failed to select and train supervisors to deal with life threatening conduct of Bureau personnel particularly in the use of the chokehold. Defendant Grier was promoted to sergeant without even filing an application and was not tested for competency prior to his promotion. Although among his duties were the obligations to observe, evaluate and control the arrest techniques of his subordinates, he had had no instruction at all in use of the chokehold or the limitations on its use. Similarly, Lt. Lauth received no training from the ABPS in the chokehold, and there is no evidence that either received training in the effects of the chokehold or the specific risks to a person on whom it is used. The court finds that the promotion of Lauth and Grier to supervisory positions in the field without any ABPS training in the use of a technique classified as deadly force, which was used in the field under these officers' command, amounted to recklessness. *Cf. Beverly v. Morris,* 470 F.2d 1356 (liability of police chief when evidence showed a complete absence of supervision or training of auxiliary police officer).

The affirmative link between Eaves and the death of McQurter is provided by the promotion or appointment of supervisory officers without insuring that they were trained in a deadly force technique used in the field. The appropriate analogy is promotion of an officer who had had no instruction in the use of a firearm. The placement of Lauth and particularly of Grier in supervisory positions was made in reckless disregard of foreseeable consequences. In the case of Grier his learning in defensive tactics was nonexistent, and his placement in a supervisory position without any knowledge or training in the use of the chokehold had almost inevitable consequences. *See Owens v. Haas,* 601 F.2d 1242, 1246–47 (2d Cir.1979); *see also Bowen v. Watkins,* 669 F.2d 979 (5th Cir.1982); *Edmonds v. Dillin,* 485 F.Supp. 722, 727 (N.D.Ohio 1980); *Leite v. City of Providence,* 463 F.Supp. 585, 590–91 (D.R.I.1978).

There is no doubt in the court's mind that having supervisory officers of unknown competence in the field who were not trained in the very tactics whose use they were charged with supervising played a decisive role in the death of Bennie McQurter. This amounts to gross negligence and deliberate indifference to almost inevitably resulting constitutional violations. Thus, Commissioner Eaves and the City of Atlanta are liable for the death of Bennie McQurter.

*VI. Damages.*

■ One of the basic purposes of a damages award under § 1983 is to compensate persons wronged by the deprivation of constitutional rights. *Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978). As well as being entitled to recover for the deprivation of the constitutional right itself, the plaintiff may recover for injuries that are the natural consequence of the deprivation. *See Whirl v. Kern,* 407 F.2d 781, 797 (5th Cir.1969).

The plaintiff, who is the former wife of Bennie McQurter and the administratrix of his estate, brought this action on behalf of herself and of the estate and for the benefit of their son and of Mr. McQurter's mother. In her complaint she prayed for actual damages of $500,000 and punitive damages of $500,000. Whether these persons are entitled to compensation in a § 1983 suit for the injuries suffered by McQurter is determined, under 42 U.S.C. § 1988, by reference to "the common law, as modified and changed by the constitution and statutes of the [forum] State . . . so far as the same is not inconsistent with the Constitution and laws of the United States." State law is "the principal reference point in determining survival of civil rights actions," *Robertson v. Wegmann,* 436 U.S. 584, 589–90, 98 S.Ct. 1991, 1994–95, 56 L.Ed.2d 554 (1978), and is useful in determining the elements of damages. *Carey,* 435 U.S. at 257–58, 98 S.Ct. at 1048–49.

■ Under Georgia law "[t]he widow or, if there is no widow, a child or children, either minor or sui juris, may recover for the homicide of the husband or father the full value of the life of the decedent, as shown by the evidence." O.C.G.A. § 51–4–2(a). Federal courts have used this statute to determine the survival of an action and the proper plaintiff for suits arising from the death of persons at the hands of police officers. *E.g., Brazier v. Cherry,* 293 F.2d 401 (5th Cir.1961); *Anderson v. Jones,* 508 F.Supp. 399 (N.D.Ga.1980). Furthermore, under Georgia law a tort claim is not extinguished by the death of the injured party but survives in his personal representative, here his wife. O.C.G.A. § 51–4–5(a).[4] Under Georgia law the plaintiff as the widow of Bennie McQurter may recover the full value of his life, which means "the full value of the life of the decedent without deducting for any of the necessary or personal expenses of the decedent had he lived." O.C.G.A. § 51–4–1(1). The defendants concede that the plaintiff may recover for funeral and medical expenses. O.C.G.A. § 51–4–5; *see Isom v. Schettino,* 129 Ga.App. 73, 199 S.E.2d 89 (1973).

Because under Georgia law evidence of separation or of the fact of support by the husband is not relevant to a determination of the amount recoverable for the full value of the life of the decedent, such evidence has not been considered here. *See Willitt v. Purvis,* 276 F.2d 129, 131–32 (5th Cir.1960); *Wright v. Dilbeck,* 122 Ga.App. 214, 216, 176 S.E.2d 715 (1970); *cf. Vickers v. Vickers,* 210 Ga. 488, 491, 80 S.E.2d 817 (1954).

■ The full value of the life of the decedent has been construed by the Georgia courts to mean "the gross sum that the deceased would have earned to the end of his life, had he not been killed, reduced to its present cash value. . . . In arriving at the amount of damages . . . [the court] should consider the age of the deceased at the time of his death, his health, his habits, the amount of money he was earning, his expectation of life, the probable loss of employment, voluntary abstinence from work, dullness in business, reduction of wages, increasing infirmities of age, . . . and other causes which may contribute to illustration of the gross earnings of a lifetime." *Pollard v. Boatwright,* 57 Ga.App. 565, 568, 196 S.E. 215 (1938) (cited in *Miller v. Tuten,* 137 Ga.App. 188, 190, 237 (1976).) This formula does not bind the factfinder "to find the lifetime earnings reduced to present value is the full value of the life of the decedent, but such is an aid only . . . in making such determination." *Kerr v. Mims,* 130 Ga.App. 54, 55, 202 S.E.2d 244 (1973). The award may reflect also the value of the intangible relationship between the decedent and his wife and child which was destroyed. *See Bulloch County Hospital Authority v. Fowler,* 124 Ga.App. 242, 247–48, 183 S.E.2d 586 (1971).

The evidence showed that at the time of his death at age 25, McQurter had an anticipated life expectancy of an additional 45.82 years. Although at the time of his death in 1977 McQurter was not steadily employed, he had been continuously employed from 1971 to November of 1976. Awards for loss of future earnings at the minimum wage rate have been made when the person was neither employed nor employable due to incarceration. *See Roberts v. Williams,* 456 F.2d 819, 833 (5th Cir.1972). Therefore, despite the fact that McQurter was unemployed at the time of his death, the court considers $150,000 an appropriate sum for the loss of his future earnings, plus funeral expenses of $1,426.92.

■ The plaintiff asserts that in addition to the value of decedent's life, his estate is entitled to recover for the pain, suffering, emotional distress and humilia-

---

4. Since Georgia law provides that the right of recovery for homicide of a child for the full value of the life of the child is in the parent or parents only "if the deceased child does not leave a spouse or child," and because McQurter left both a spouse and a child, his mother is not entitled to recover damages in this action. *Cf. Royal Crown Bottling Co. v. Bell,* 100 Ga.App. 438, 111 S.E.2d 734 (1959) (where child had married but was survived by neither husband nor children, her mother was entitled to recover for the full value of her life).

tion suffered by Bennie McQurter before his death. The court considers such an award appropriate for the pain, suffering from slow asphyxiation, and humiliation suffered by McQurter before his death caused by the individual defendants and the City of Atlanta in the amount of $40,000. For the deprivation of his rights when he was subjected to excessive force and given no medical treatment and deprived of his life, the court considers adequate compensation by the individual defendants to be $10,000. Thus, the plaintiff is awarded damages in the total amount of $200,000 against the City, Eaves, Lauth, Grier, Duncan and Burdette.

■ Plaintiff also seeks punitive damages. The City of Atlanta is immune from punitive damages under the Supreme Court's holding in *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). As to the individual defendants, punitive damages may be awarded under appropriate circumstances with the specific purpose of deterring or punishing violations of constitutional rights. *Carey v. Piphus,* 435 U.S. at 257 n. 11, 98 S.Ct. at 1049 n. 11. An important factor in determining whether an award of punitive damages is appropriate is the nature of the defendants' conduct, particularly whether they acted with "malicious intention." *Id; see, e.g., Barker v. Norman,* 651 F.2d 1107, 1122 n. 19 (5th Cir.1981). Deterrence is also a factor in awarding punitive damages in cases of excessive use of force to deter police officers from future abuses of their authority. *See, e.g., Palmer v. Hall,* 517 F.2d 705 (5th Cir.1975); *Stengel v. Belcher,* 522 F.2d 438 (6th Cir.1975). The court believes that punitive damages are appropriate for Duncan's continued application of the chokehold and awards $5,000 in punitive damages against Duncan.

The court also believes that punitive damages are appropriate for the officers' callous indifference and reckless disregard for McQurter's medical condition and awards $20,000 in punitive damages jointly against Burdette, Duncan, Lauth and Grier for this violation.

Finally, plaintiff seeks attorney's fees pursuant to 42 U.S.C. § 1988. The award is GRANTED, and plaintiff is DIRECTED to file affidavits and a brief in support of the amount requested within thirty (30) days of the filing date of this order, and defendant is to file a response, if any, within twenty (20) days of service of plaintiff's affidavits and brief.

*VI. Injunctive Relief.*

■ Plaintiff seeks a permanent injunction prohibiting the use of the chokehold by the ABPS. She argues that its continued use despite the ABPS' cessation of training in the chokehold presents the danger of recurring injuries for which, if they occurred, the defendants could be held strictly liable. The defendants argue that plaintiff lacks standing to seek an injunction against use of the chokehold because she has not demonstrated that she is likely to be a person who will be so violent as to warrant the use of the chokehold by the ABPS against her. Furthermore, defendants argue, there is no factual basis for issuing such an injunction since use of the hold is not so egregious that its use should be stopped completely.

Under the Supreme Court's holding in *City of Los Angeles v. Lyons,* —— U.S. ——, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the plaintiff's request for injunctive relief fails to satisfy the "case or controversy" requirement of Article 3 of the United States Constitution since she has not demonstrated that she "has sustained or is immediately in danger of sustaining some direct injury" as the result of use of the chokehold by the ABPS. Therefore, her request for an injunction prohibiting the use of the chokehold by the ABPS is DENIED.

*VII. Plaintiff's Motion for the Court to Take Judicial Notice and to Reopen Discovery.*

Plaintiff's motion and supporting authorities having been read and considered by the court in conjunction with defendants' response thereto, the motion is DENIED.

**1424**

*VIII. Conclusion.*

The Clerk of the Court is DIRECTED to enter judgment for the plaintiff and against defendants City of Atlanta, Georgia, A. Reginald Eaves, Kenneth E. Duncan, R. Keith Burdette, N.D. Lauth and E.W. Grier in the amount of damages outlined above.